**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **RED ROOF FRANCHISING, LLC,**<br>**7815 Walton Parkway, New Albany, Ohio**<br>**43054**<br><br>      **Plaintiff,**<br><br>**v.**<br><br>**JPR HOSPITALITY, INC.,**<br>**1000 John R. Road, Suite 214**<br>**Troy, Michigan 48083**<br><br>**and**<br><br>**JANANTIK N. PANDYA,**<br>**30250 John R. Road,**<br>**Madison Heights, Michigan 48071,**<br><br>**and**<br><br>**RITESH M. VAIDYA,**<br>**3058 Metropolitan Parkway, Suite 102,**<br>**Sterling Heights, Michigan 48310,**<br><br>      **Defendants.** | Case No: 2:23-cv-862<br><br>Judge: |

## COMPLAINT

For its Complaint against Defendants JPR Hospitality, Inc., Janantik N. Pandya ("Pandya"), and Ritesh M. Vaidya ("Vaidya") (collectively, "Defendants"), Plaintiff Red Roof Franchising, LLC hereby pleads and avers as follows:

## PARTIES

1.  Plaintiff Red Roof Franchising, LLC ("Red Roof") is a Delaware limited liability company with its principal place of business located at 7815 Walton Parkway, New Albany, Ohio 43054.

2.      Defendant JPR Hospitality, Inc. ("JPR") is a Michigan Corporation with its principal place of business at 1000 John R. Road, Suite 214, Troy, Michigan 48083.

3.      Upon information and belief, Defendant Pandya is an individual who resides at 30250 John R. Road, Madison Heights, Michigan 48071 and/or 13893 Monte Vista Drive, Frisco, Texas 75035-5337.

4.      Upon information and belief, Defendant Vaidya is an individual who resides at 3058 Metropolitan Parkway, Suite 102, Sterling Heights, Michigan 48310-3600 and/or 412 Winding Ridge Trail, Southlake, Texas 76092-1373.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction over this matter pursuant to 15 U.S.C. §§ 1121, 1331, 1332, and 1338 and 17 U.S.C. § 101, et seq.

6.      This Court has supplemental jurisdiction over the pendent state law claims in this action pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this District pursuant to the terms of a forum selection clause contained in a written agreement between the parties.  Specifically, Section 17.7 of the Franchise Agreement between Red Roof and JPR provides that the contracting parties "irrevocably submit themselves to the jurisdiction of the state and federal courts located in Columbus, Ohio having subject matter jurisdiction of the claim, and hereby waive all objections to personal jurisdiction for the purpose of carrying out this provision."  A true and correct copy of the subject October 23, 2018 Franchise Agreement (the "Franchise Agreement") is attached as **Exhibit A**.

**FACTS**

A.      **Red Roof Franchising**

8.      Over the years, Red Roof has developed and refined a distinctive system for the establishment and operation of motels that are designed to compete directly with other brands in

2

the economy segment of the lodging market.  Red Roof motels operate under the trade name and service mark RED ROOF INN® and other designated proprietary marks (the "Red Roof Marks") for which Red Roof holds/owns multiple trademark registrations.  True and accurate copies of Red Roof's certificates of registration for the Red Roof Marks are attached as **Exhibit B**.

9.      Using the Red Roof Marks, Red Roof franchises its system throughout the United States.  Since the first Red Roof Inn opened in 1973 in Grove City, Ohio, over 500 locations have been opened nationally and internationally.

10.      Red Roof also holds a copyright over the artwork for the Red Roof signs displayed on and around franchised properties (the "Red Roof Copyright").  A true and accurate copy of Red Roof's registration certificate for the Red Roof Copyright is attached as **Exhibit C**.

11.      Red Roof has also developed and owns the Red Roof distinctive trade dress, which comprises several elements and includes but is not limited to, the Red Roof slanted roof design, Red Roof's distinctive red color roof tiles, the distinctive red color used in connection with the exterior and interior of Red Roof properties, and the tower design used in connection with the display of Red Roof signage (collectively, the "Red Roof Trade Dress").

**B.**      **The Franchise Agreement**

12.      On or about October 23, 2018, Red Roof and JPR entered into the subject Franchise Agreement, under which Red Roof granted JPR certain licenses for the operation of a Red Roof Inn at 1214 Corporate Drive, Holland, Ohio 43528 (the "Subject Property").  *See* **Exhibit A**.

13.      Specifically, under Section 1.1 of the Franchise Agreement, Red Roof grants JPR the right, and JPR accepts the obligation, to "operate the Inn as a Red Roof Inn at the Approved Location and to use the System and Proprietary Marks in compliance with the Standards and the terms of this Franchise Agreement in connection with the ownership and operation of the Inn."

14. As detailed in Section 2.1 of the Franchise Agreement and the attached Exhibit A thereto, the initial term of the Franchise Agreement was to expire twenty (20) years after the Effective Date, October 23, 2018, unless terminated prior to that time in accordance with the terms of the Franchise Agreement.

15. Section 4 of the Franchise Agreement requires that JPR make certain payments to Red Roof, including a monthly Royalty Fee, a Marketing and Reservation Fee, a Preferred Members Program Fee, Booking Fees, and other fees relating to the operation of the Subject Property.

16. Pursuant to Section 4.6 of the Franchise Agreement, in the event JPR fails to pay an invoice by its due date, Red Roof has the right to impose a late fee of fifty dollars ($50) and charge interest in an amount equal to the lesser of (a) eighteen percent (18%) interest per annum or (b) the maximum rate permitted by law.

17. Pursuant to Section 13.2.12 of the Franchise Agreement, the contracting parties agree that a failure and/or refusal by JPR to pay any monies owing to Red Roof when due under the Franchise Agreement would constitute a default.

18. Pursuant to the Franchise Agreement's Renovation Addendum and attached Schedules, JPR is also required to make certain improvements to the Subject Property within a certain time period.

19. Pursuant to Section 13.2.11 of the Franchise Agreement, the contracting parties agree that a failure by JPR to strictly comply with the terms of the Renovation Addendum by the specified dates would constitute a default.

20. Pursuant to Section 13.3 of the Franchise Agreement, Red Roof retains the right to terminate the Franchise Agreement upon the occurrence of any of the events of default, including

those outlined in Sections 13.2.11 and/or 13.2.12, with such termination being effective (a) immediately upon written notice upon the occurrence of the events set forth in Section 13.2.11 and/or (b) following a five day cure period (if still uncured) for monetary defaults after written notice upon the occurrence of the events set forth in Section 13.2.12.

21. Pursuant to Section 8 of the Renovation Addendum to the Franchise Agreement, JPR acknowledges that the failure to meet the deadlines set forth in the Renovation Addendum or Schedules A or B attached thereto would constitute an event of default.

22. Upon termination, Section 14.1.1 of the Franchise Agreement requires JPR to "[i]mmediately cease to operate the Inn under the System and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former Red Roof Inn franchisee."

23. Section 14.1.2 of the Franchise Agreement further requires that upon termination, JPR immediately and permanently cease to use the name "Red Roof Inn" and any other Red Roof intellectual property or identifying characteristics of the Red Roof system, including but not limited to the Red Roof Marks and the Red Roof Copyright (together, the "Red Roof Intellectual Property").

24. JPR is further obligated upon termination to "remove and discontinue using for any purpose, any and all signs" and other articles which displayed the Red Roof Intellectual Property. Specifically, Section 14.1.2 provides that "[a]ny signs bearing the [Red Roof Intellectual Property] which [JPR is] unable to remove within one (1) day following expiration or termination of this Franchise Agreement shall be completely covered by [JPR] until the time of their removal, which shall be within ten (10) days following the expiration or termination of this Franchise Agreement."

25. Pursuant to Section 14.1.7 of the Franchise Agreement, JPR further agrees that, upon termination or expiration of the Franchise Agreement, JPR shall "[p]ay upon demand to [Red

Roof] all damages, costs and expenses, including reasonable attorneys' fees, incurred by [Red Roof] in connection with [JPR's] default and/or the early termination or expiration of this Franchise Agreement including, without limitation . . . those incurred to enforce and/or obtain injunctive or other relief in connection with this Section 14."

26.     In connection with JPR's execution and acceptance of obligations under the Franchise Agreement, Defendants Pandya and Vaidya (collectively, "Guarantors") executed a Guarantee, Indemnification and Acknowledgement (the "Guarantee") in favor of JPR.  The Guarantee is attached to the Franchise Agreement as Exhibit C.

27.     Pursuant to the terms of the Guarantee, Guarantors agree, among other things, "to guarantee to [Red Roof] . . . the due, complete and punctual performance and observance of all of [JPR's] financial obligations under the Franchise Agreement including, without limitation, the due and timely performance of all payment obligations." Further, Guarantors agree "to be individually bound by all of the terms of the Franchise Agreement," including "all covenants which by their terms continue in force after the expiration or termination of the Franchise Agreement."

28.     Under the Guarantee, Guarantors also agree, among other things, to "pay [Red Roof] . . . for all costs and expenses (including, but not limited to, reasonable attorneys' fees and court costs) [it may] incur in connection with any action … to enforce this Guarantee or any other action related to or arising out of this Guarantee in which [Red Roof] . . . is deemed to be the prevailing party."

C.    **JPR's Default and Termination of the Franchise Agreement**

29.    Despite having agreed to timely pay the fees set forth in Section 4 of the Franchise Agreement, JPR failed to make all required payments to Red Roof when due.  In addition, JPR failed to make certain improvements to the Subject Property as required and set forth in Schedule B to the Renovation Addendum of the Franchise Agreement.

30.    As a result, on March 19, 2021, Red Roof sent JPR a Notice of Default (the "First Notice") informing JPR that it had an outstanding balance of $22,817.14 owed to Red Roof, it had completed 0% of the Property Improvement Plan, and the quality standards were below brand standards. Red Roof demanded that JPR cure the monetary default within 5 days and complete the required renovations on or before May 31, 2021. A true and accurate copy of the First Notice is attached hereto as **Exhibit D**.

31.    On April 9, 2021, Red Roof sent JPR a second Notice of Default (the "Second Notice") informing JPR that the Inn was not in compliance with Red Roof's system standards. Red Roof demanded that JPR undertake short-term renovations, as required under Section 5.1 of the Franchise Agreement, to cure the issues of non-compliance. A true and accurate copy of the Second Notice is attached hereto as **Exhibit E**.

32.    The Second Notice attached a list of the required short-term renovations and obligated JPR to complete those renovations by May 31, 2021. The Second Notice also advised that JPR's failure to complete the short-term renovations would constitute a default of the Franchise Agreement.

33.    On June 10, 2021, Red Roof sent JPR a Notice of Default and Termination (the "Termination Letter"). The Termination Letter stated that JPR had failed to complete the short-term renovations listed in the Second Notice. Red Roof therefore notified JPR that, in accordance

with Section 13.3, the Franchise Agreement was terminated effective as of June 11, 2021. A true and accurate copy of the Termination Letter is attached hereto as **Exhibit F**.

34. The Termination Letter reminded JPR of its obligations upon termination, set forth in Section 14 of the Franchise Agreement, including the following:

      a. Ceasing to represent to the public or hold itself out as a present or former Red Roof Inn franchisee;

      b. Immediately and permanently ceasing to use, by advertising or in any other manner whatsoever, the name "Red Roof Inn," any other Proprietary Marks or identifying characteristics of the System;

      c. Immediately making such modifications or alterations as may be necessary to distinguish the Inn so clearly from its former appearance and from other Red Roof Inns as to prevent any possibility of confusion by the public;

      d. Taking such actions as may be necessary to cancel any trade, fictious, or assumed name or equivalent registration which contains the mark "Red Roof Inn" or any other Proprietary Marks;

      e. Refraining from using any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, in connection with the operation of any business; and

      f. Timely paying Red Roof all sums owed to it, its affiliates, and its approved or designated suppliers, including liquidated damages.

35. Despite having received notice and being reminded of the foregoing, Defendants have failed and/or refused to comply with the Termination Letter and have continued to violate and breach the terms of the Franchise Agreement.

**D.** **Defendants' Continuing, Unauthorized Use of the Red Roof Intellectual Property and Red Roof Trade Dress**

36.     Among other things, Defendants have failed to satisfy their obligations under the Franchise Agreement by failing to pay liquidated damages, failing to cease operating the Inn under the Red Roof System, continuing to represent to the public or hold themselves out as a Red Roof Inn franchisee, advertising the Subject Property under the name "Red Roof Inn," failing to make modifications or alterations to distinguish the Subject Property from other Red Roof Inns, and continuing to use reproductions, counterfeits, copies, and colorable imitation of the Red Roof Intellectual Property.

37.     As a result, by letter dated July 29, 2021, Red Roof demanded in writing that Defendants de-identify the Subject Property within ten days and immediately and permanently cease and desist from all further use of the Red Roof Intellectual Property.  A true copy of the Demand to Cease and Desist (the "Demand Letter") is attached as **Exhibit G**.

38.     Defendants have willfully disregarded the Demand Letter and have continued displaying Red Roof signage near the entrance, the street, and towers, which is not only a breach of the Franchise Agreement and Guarantee, but also violates Red Roof's statutory rights with regard to the protection and use of the Red Roof Intellectual Property.

39.     On information and belief, Defendants' continued, unlawful, and infringing use of the Red Roof Intellectual Property has caused, and will continue to cause, customer confusion in the future, diluting the distinctive quality of Red Roof's Intellectual Property and Trade Dress. Defendants' continued, unlawful, and infringing use will also dilute Red Roof's business reputation by implying that the Subject Property is somehow affiliated with or connected to Red Roof.  As a result, such activities by Defendants have caused and will continue to cause Red Roof to incur damages in an amount to be determined at trial.

**COUNT I**
**TRADEMARK INFRINGEMENT**
**(Against All Defendants)**
**(15 U.S.C. § 1114)**

40.     Red Roof hereby incorporates the foregoing paragraphs by reference as though fully set forth herein.

41.     Red Roof owns all rights, title, and interest in and to the Red Roof Marks, which have been registered with the United States Patent and Trademark Office.

42.     The Red Roof Marks are strong and distinctive and designate Red Roof as the source of all products and services advertised, marketed, sold, or used in connection with the Red Roof Marks.  The Red Roof Marks and the business reputation and goodwill associated with their use in the United States are therefore of great value, are highly distinctive, and have become associated in the mind of the public with motel services of a standard nature and particular quality and reputation.

43.     Without Red Roof's authorization or consent, and with knowledge of Red Roof's well-known rights in and to the Red Roof Marks, Defendants have reproduced, counterfeited, and sold counterfeit services to the consuming public of the United States in direct competition with Red Roof in or affecting interstate commerce.

44.     Specifically, Defendants have continued to use the Red Roof Marks and/or trade and marketing materials that are confusingly similar to the Red Roof Marks, which have been used by Defendants to market products and services that are virtually identical and/or closely related to the products and services associated with the Red Roof Marks.

45.     By so doing, Defendants have misappropriated, used, and/or counterfeited the Red Roof Marks, and these actions by Defendants have been knowing, intentional, and willful.  Indeed, Defendants' acts demonstrate an intentional, willful, and malicious intent to trade on the goodwill

associated with the Red Roof Marks to Red Roof's great and irreparable injury. In committing these wrongs, the Defendants acted willfully within the meaning of 15 U.S.C. § 1117(c)(2).

46.     On information and belief, Defendants' use of the Red Roof Marks has caused and will continue to cause confusion, mistake, and deception among the general purchasing public as to the origin of Defendants' services, and deceived the public into believing that Defendants' services originate from, are associated with, or are otherwise authorized by Red Roof, all to the damage and detriment of Red Roof's reputation, goodwill, and profits.

47.     Defendants' continuing use of the Red Roof Marks and/or reproductions, counterfeits, and copies of the Red Roof Marks constitute trademark infringement, in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

48.     Defendants' unauthorized use of the Red Roof Marks as set forth above has resulted in Defendants unfairly benefitting from Red Roof's advertising and promotion and has allowed Defendants to profit from Red Roof's reputation and their registered Red Roof Marks, to the substantial and irreparable injury of the public, Red Roof, and the Red Roof Marks, and the substantial goodwill represented thereby.

49.     Defendants' activities have caused and will continue to cause irreparable harm to Red Roof, for which it has no adequate remedy at law, because: (i) the Red Roof Marks comprise unique and valuable property rights that have no readily determinable market value; (ii) Defendants' infringement constitutes interference with Red Roof's goodwill and customer relationships and is harming and will continue to substantially harm Red Roof's reputation as a source of high-quality goods and services; and (iii) Defendants' wrongful conduct, and the damages resulting to Red Roof, are continuing. Accordingly, Red Roof is entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a).

50. Pursuant to 15 U.S.C. §1117(a), Red Roof is also entitled to an order: (i) requiring Defendants to account to Red Roof for any and all profits derived from their infringing actions, to be increased in accordance with the applicable provisions of law; (ii) awarding Red Roof all damages it has sustained as a result of Defendants' conduct; and (iii) awarding Red Roof its costs incurred in pursuing this action.

51. Because Defendants' conduct was and is intentional and without foundation in law, and, pursuant to 15 U.S.C. § 1117(a), Red Roof is also entitled to an award of treble damages against Defendants for their infringement of the Red Roof Marks.

## COUNT II
## FEDERAL UNFAIR COMPETITION/TRADE DRESS INFRINGEMENT/
## FALSE DESIGNATION OF ORIGIN
### (Against All Defendants)
### (15 U.S.C. § 1125(a))

52. Red Roof hereby incorporates the foregoing paragraphs by reference as though fully set forth herein.

53. Red Roof has invested in and owns all rights, title, and interest in and to the Red Roof Trade Dress, which includes the Red Roof Intellectual Property.

54. The Red Roof Trade Dress is distinctive in the marketplace and has acquired secondary meaning.

55. Specifically, the Red Roof Trade Dress has come to designate Red Roof as the source of all goods and services advertised, marketed, sold, or used in connection with the related and incorporated marks and other characteristics.

56. In addition, by virtue of Red Roof's decades of use of the Red Roof Trade Dress in connection with its products and services, and its extensive marketing, advertising, promotion, and sale of its products and services under and in connection with the Red Roof Trade Dress and Red Roof Intellectual Property, the Red Roof Trade Dress has acquired secondary meaning, whereby

the consuming public of this District, the State of Ohio, and the United States associate the Red Roof Trade Dress and Red Roof Intellectual Property with a single source of products and services.

57. Defendants are aware of Red Roof's exclusive rights in the Red Roof Trade Dress and Red Roof Intellectual Property but have knowingly and willfully used the Red Roof Trade Dress and Red Roof Intellectual Property to market, promote, and rent rooms at the Subject Property using the Red Roof Trade Dress and Red Roof Intellectual Property.

58. By knowingly and willfully continuing their unauthorized use the Red Roof Trade Dress and Red Roof Intellectual Property to market and promote their goods and services, Defendants intended to, and have in fact, confused and misled consumers into believing, and misrepresented and created the false impression, that Red Roof authorized, originated, sponsored, approved, licensed, or participated in Defendants' use of the Red Roof Trade Dress and/or Red Roof Intellectual Property.

59. In fact, following the termination of the Franchise Agreement on June 11, 2021, there has been no connection, association, or licensing relationship between Red Roof and Defendants, nor has Red Roof authorized, licensed, or given permission to Defendants to use the Red Roof Trade Dress and/or Red Roof Intellectual Property in any manner. As such, Defendants, by marketing, promoting, and renting rooms at the Subject Property bearing the Red Roof Trade Dress, have (on information and belief) caused confusion and mistake among prospective or actual customers, in violation of 15 U.S.C. § 1125(a).

60. Defendants' actions thus constitute false designation of origin and unfair competition, and as a direct and proximate result of Defendants' wrongful conduct, Red Roof has been and will continue to be damaged.

61.     Defendants' activities have also caused, and will continue to cause, irreparable harm to Red Roof, for which it has no adequate remedy at law, in that: (i) the Red Roof Trade Dress and Red Roof Intellectual Property comprise unique and valuable property carrying a market value that cannot easily be determined; (ii) Defendants' infringement constitutes interference with Red Roof's goodwill and customer relationships and will substantially harm Red Roof's reputation as a source of goods and services; and (iii) Defendants' wrongful conduct, and the damages resulting to Red Roof are continuing.  Accordingly, in addition to damages, Red Roof is entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a).

62.     Pursuant to 15 U.S.C. §1117(a), Red Roof is entitled to an order: (i) requiring Defendants to account to Red Roof for any and all profits derived from their actions, to be increased in accordance with the applicable provisions of law; and (ii) awarding all damages sustained by Red Roof that have been caused by Defendants' conduct.

63.     Defendants' conduct was and is intentional and without foundation in law, and pursuant to 15 U.S.C. § 1117(a), Red Roof is therefore entitled to an award of treble damages against Defendants.

64.     Defendants' acts make this an exceptional case under 15 U.S.C. § 1117(a); thus Red Roof is also entitled to an award of attorneys' fees and costs.

**COUNT III**
**COPYRIGHT INFRINGEMENT**
**(Against All Defendants)**
**(17 U.S.C. § 101, *et seq.*)**

65.     Red Roof hereby incorporates the foregoing paragraphs by reference as though fully set forth herein.

66.     Red Roof owns the Red Roof Copyright.

67.   Defendants, through the actions described in this Complaint, have violated Red Roof's exclusive rights in the Red Roof Copyright by continuing to display Red Roof signage on the Subject Property without permission, and without legal justification of any kind.

68.   Defendants' actions are and were intentional and willful and constitute copyright infringement, as a result of unlawful, widespread advertising activities to the public

69.   Defendants' acts of copyright infringement have inflicted irreparable harm on Red Roof, which is therefore entitled to injunctive relief, as well as an award of damages under 17 U.S.C. § 504 (b) and/or (c).

## COUNT IV
## OHIO DECEPTIVE TRADE PRACTICES ACT
### (Against All Defendants)
### (Ohio Revised Code § 4165 *et seq.*)

70.   Red Roof hereby incorporates the foregoing paragraphs by reference as though fully set forth herein.

71.   Via the actions described above, Defendants have violated the Ohio Deceptive Trade Practices Act.

72.   Defendants' continuing use of the Red Roof Marks and Red Roof Trade Dress on unauthorized goods and services is likely to cause confusion as to the origin of Defendants' goods and services and is likely to cause others to believe that there is a relationship between Defendants and Red Roof, and/or that Red Roof has authorized Defendants to use the Red Roof Intellectual Property.

73.   Defendants' wrongful acts have permitted and will permit them to receive substantial profits based upon the strength of Red Roof's reputation and the substantial goodwill it has built up in the Red Roof Intellectual Property and Red Roof Trade Dress.

74.     As a direct and proximate result of Defendants' wrongful conduct, Red Roof has been and will continue to be harmed and is entitled to recover damages pursuant to Ohio Rev. Code § 4165.03(A)(2).

75.     Unless an injunction is issued enjoining any continuing or future use of the Red Roof Intellectual Property by Defendants, such continuing or future use is likely to continue to cause confusion amongst consumers and thereby irreparably damage Red Roof.  Red Roof has no adequate remedy at law for such harm caused by Defendants' improper use and is therefore entitled to injunctive relief pursuant to Ohio Rev. Code § 4165.03(A)(1).

76.     At all relevant times, Defendants' wrongful conduct has been willful, and Defendants knew their actions were deceptive.  Accordingly, Red Roof is also entitled to recover its reasonable attorneys' fees and costs pursuant to Ohio Rev. Code § 4165.03(B).

**COUNT V**
**COMMON LAW UNFAIR COMPETITION**
**(Against All Defendants)**

77.     Red Roof hereby incorporates the foregoing paragraphs by reference as though fully set forth herein.

78.     Red Roof has valid and protectible common law rights in and to the Red Roof Trade Dress and the Red Roof Intellectual Property.

79.     Defendants' use of the Red Roof Trade Dress and the Red Roof Intellectual Property has caused and is likely to continue to cause confusion, deception, and mistake by creating the false and misleading impression that Defendants' services originate from Red Roof, are associated or connected with Red Roof, and/or have Red Roof's sponsorship, endorsement, or approval.

80.     The natural and probable tendency and effect of Defendants' conduct is to deceive the public so as to pass off the services and/or business of Defendants as and for those of Red

Roof. Defendants have caused and are likely to continue to cause substantial injury to the public and to Red Roof, thereby entitling Red Roof to injunctive relief, and to recover actual damages, costs, and reasonable attorneys' fees.

81. Defendants' wrongful conduct was willful and deliberate or recklessly indifferent to the rights of Plaintiffs and, on information and belief, has permitted Defendants to receive a benefit from misappropriating Red Roof's efforts and exploiting Red Roof's reputation and the Red Roof Intellectual Property and Trade Dress to market and sell their services. These actions by Defendants constitute unfair competition under Ohio law.

82. As a direct and proximate result of Defendants' unfair competition, Red Roof has been and will continue to be damaged.

83. Because Defendants have willfully and intentionally engaged in these acts of unfair competition, Red Roof is also entitled to recover punitive damages.

### COUNT VI
### BREACH OF CONTRACT
**(Franchise Agreement – against JPR)**

84. Red Roof hereby incorporates the foregoing paragraphs by reference as though fully set forth herein.

85. Under the terms of the Franchise Agreement, Red Roof granted JPR the right and license to establish and operate a franchised Red Roof Inn located at the Subject Property, in exchange for JPR performing its contractual obligations, including timely payment of all fees set forth in Section 4 of the Franchise Agreement and making certain improvements to the Subject Property as required and set forth in Schedule B to the Renovation Addendum of the Franchise Agreement.

86.     JPR has breached the Franchise Agreement by failing to perform these and other contractual obligations, including failing to pay liquidated damages, failing to cease operating the Inn under the Red Roof System following termination, continuing to represent to the public or hold itself out as a Red Roof Inn franchisee, advertising the Subject Property under the name "Red Roof Inn," failing to make modifications or alterations to distinguish the Subject Property from other Red Roof Inns, and continuing to use reproductions, counterfeits, copies, and colorable imitation of the Red Roof Intellectual Property.

87.     Red Roof has fully performed all of its obligations under the Franchise Agreement.

88.     JPR's breaches and violations of the Franchise Agreement have caused Red Roof to incur damages in an amount to be proven at trial, in addition to the liquidated damages it is entitled to recover under the terms of the Franchise Agreement.

89.     As a result of JPR's breaches of the Franchise Agreement, Red Roof is also entitled to an order permanently enjoining JPR from further and/or continued use of the Red Roof Intellectual Property.

90.     Under the terms of the Franchise Agreement, Red Roof is also entitled to recover from JPR its reasonable attorneys' fees and costs incurred in connection with JPR's default and the termination of the Franchise Agreement, including its costs and fees incurred in this matter.

**COUNT VII**
**BREACH OF CONTRACT**
**(Guarantee – against Guarantors)**

91.     Red Roof hereby incorporates the foregoing paragraphs by reference as though fully set forth herein.

92.     Pursuant to the terms of the Guarantee, Guarantors agreed, among other things, "to guarantee to [Red Roof] . . . the due, complete and punctual performance and observance of all of

[JPR's] financial obligations under the Franchise Agreement including, without limitation, the due and timely performance of all payment obligations."

93. Guarantors also agreed "to be individually bound by all of the terms of the Franchise Agreement," including "all covenants which by their terms continue in force after the expiration or termination of the Franchise Agreement."

94. Red Roof has fully performed all of its obligations in connection with the Guarantee.

95. As a result of JPR's default, violation, and breach of the Franchise Agreement, Guarantors are liable to Red Roof for all amounts owed to Red Roof by JPR.

96. Guarantors have failed and/or refused to pay the amounts due to Red Roof under the Franchise Agreement and Guarantee.

97. Guarantors have also failed and/or refused to secure JPR's compliance with its contractual obligations to Red Roof, including payment of amounts due to Red Roof and cessation of JPR's continuing violations of Red Roof's contractual and statutory intellectual property rights.

98. Guarantors have therefore breached the Guarantee, and Red Roof is entitled to recover from Guarantors all amounts due and owing under the Franchise Agreement and Guarantee.

99. Under the terms of the Franchise Agreement and Guarantee, Red Roof is also entitled to recover from Guarantors all of Red Roof's reasonable attorneys' fees and costs incurred in connection with such breaches, including all fees and costs incurred in this matter.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff Red Roof Franchising, LLC ("Red Roof") prays the Court enter

judgment in its favor and award it relief as follows:

1. That Red Roof be awarded and recover from Defendants the amounts due and owing under the Franchise Agreement, together with interest, attorneys' fees, and costs of suit, and all other fees that should be paid to compensate Plaintiff for Defendants' breach of the Franchise Agreement;

2. That the Court enter an order permanently restraining and enjoining Defendants, their agents, servants, employees, and other person in active concert with Defendants from any and all further use of the Red Roof Marks and any other name or mark confusingly similar to the Red Roof Marks;

3. That the Court enter an order permanently restraining and enjoining Defendants, their agents, servants, employees, and other person in active concert with Defendants from any and all further use of the Red Roof Copyright and any other work that reflects, resembles, and/or incorporates the Red Roof Copyright;

4. That the Court enter an order permanently restraining and enjoining Defendants, their agents, servants, employees, and other person in active concert with Defendants from any and all further use of the Red Roof Trade Dress and any other trade dress that is substantially similar to the Red Roof Trade Dress;

5. That pursuant to 15 U.S.C. § 1116, Defendants be directed to file with the Court and serve upon Red Roof within thirty (30) days after issuance of an injunction, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

6. That Red Roof be awarded actual and/or statutory damages to which they are entitled as a result of Defendants' unlawful conduct, pursuant to 17 U.S.C. § 504, Rev. Code § 4165.03, and/or other applicable law;

7. That Red Roof be awarded its costs it incurred in connection with this action pursuant to 15 U.S.C. § 1117(a), attorneys' fees and treble damages pursuant to 15 U.S.C. § 1117(b), and/or statutory damages pursuant to 15 U.S.C. § 1117(c);

8. That Red Roof be awarded its attorneys' fees and costs incurred as a result of and/or in connection with Defendants' breaches of the Franchise Agreement and Guarantee;

9. That Red Roof be awarded punitive damages; and

10. That the Court grant Red Roof such other and further relief as the Court may deem just and proper.

DATED:  March 2, 2023                    Respectfully submitted,

                                         */s/ Aaron T. Brogdon*
                                         Aaron T. Brogdon (0081858) (Trial Attorney)
                                         Frank J. Reed, Jr. (0055234)
                                         Nicole Mattingly (0101556)
                                         Frost Brown Todd LLP
                                         10 West Broad Street, Suite 2300
                                         Columbus, Ohio 43215
                                         Telephone:  614.559.7213
                                         Facsimile:  614.464.1737
                                         abrogdon@fbtlaw.com
                                         freed@fbtlaw.com
                                         nmattingly@fbtlaw.com

                                         *Attorneys for Plaintiff Red Roof Franchising, LLC*

# EXHIBIT A



**FRANCHISE AGREEMENT**

By and between

**RED ROOF FRANCHISING, LLC**

and

**JPR HOSPITALITY INC.**

**HOLLAND, OH**

**RED ROOF INN
FRANCHISE AGREEMENT**

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | GRANT | 2 |
| 2. | TERM | 3 |
| 3. | DUTIES OF FRANCHISOR | 4 |
| 4. | FEES | 4 |
| 5. | DUTIES OF FRANCHISEE | 6 |
| 6. | PROPRIETARY MARKS | 11 |
| 7. | MANUALS | 13 |
| 8. | CONFIDENTIAL INFORMATION | 14 |
| 9. | ACCOUNTING AND RECORDS | 15 |
| 10. | MARKETING PROGRAM AND RESERVATION SYSTEM | 16 |
| 11. | INSURANCE | 18 |
| 12. | TRANSFER OF INTEREST | 21 |
| 13. | DEFAULT AND TERMINATION | 25 |
| 14. | OBLIGATIONS UPON TERMINATION | 28 |
| 15. | INDEPENDENT CONTRACT & INDEMNIFICATION | 30 |
| 16. | ACKNOWLEDGMENTS AND REPRESENTATIONS | 31 |
| 17. | MISCELLANEOUS | 32 |
| | STATE ADDENDA | |

# EXHIBITS

EXHIBIT A – SUPPLEMENTAL TERMS
EXHIBIT B – OWNERSHIP SCHEDULE
EXHIBIT C – GUARANTEE, INDEMNIFICATION AND ACKNOWLEDGMENT

RENOVATION ADDENDUM
TRANSFER ADDENDUM
SPECIAL STIPULATIONS ADDENDUM

Inn #<u>058</u>

**RED ROOF INN**
**FRANCHISE AGREEMENT**

THIS RED ROOF INN FRANCHISE AGREEMENT (the "<u>Franchise Agreement</u>") is made and entered into this _2'3ᵗʰ_ day of _October_ , 20_18_, by and between RED ROOF FRANCHISING, LLC, a Delaware limited liability company ("<u>Franchisor</u>"), and **JPR HOSPITALITY INC., a Michigan corporation** ("<u>Franchisee</u>"). Capitalized terms not otherwise defined shall have the meanings as defined within this Franchise Agreement.

**RECITALS:**

Franchisor has the right to grant licenses for the establishment and operation of inns which are designed to compete directly with other brands in the economy segment of the lodging market utilizing certain procedures, policies, standards, specifications, controls, identification schemes and proprietary marks and information including prototypical architectural plans, designs, layouts and distinctive color schemes, a computer system and reservation system and management and personnel training programs (the "<u>System</u>"), all of which may be changed, improved or further developed from time to time.

The distinguishing characteristics of the System include, without limitation, the name and mark "Red Roof Inn" and the Red Roof Inn logo, together with such other trade names, service marks, trademarks and trade symbols, emblems, signs, slogans, trade dress, logos, colors, insignia and copyrights as Franchisor has adopted and has designated for use in connection with the System and as Franchisor may hereafter acquire or develop and designate for use in connection with the System (the "<u>Proprietary Marks</u>").

Franchisee desires to obtain a franchise and to obtain rights to the Proprietary Marks and to own and operate a Red Roof Inn (the "<u>Inn</u>") at the location identified on <u>Exhibit A</u> (the "<u>Approved Location</u>").

Franchisee understands and acknowledges the importance of operating in conformity with the System and of complying with such product, service and operational standards, specifications, policies and procedures for constructing or renovating the Inn, equipping the Inn, and operating the Inn (the "System <u>Standards</u>"), as may be published by Franchisor in hard copy and/or electronic form, as amended or supplemented by Franchisor in its sole discretion from time to time (the "<u>Manuals</u>").

Franchisee has conducted an independent investigation into the feasibility and advisability of establishing the Inn at the Approved Location, and has had the opportunity to consult with legal, accounting and other advisors of the Franchisee's own choosing in making a decision to enter into this Franchise Agreement and establish the Inn at the Approved Location.

As used in this Franchise Agreement, "Affiliate" or "Affiliates" means an entity or entities controlled by, controlling or under common control with, another entity.

NOW, THEREFORE, in consideration of the mutual undertakings and commitments set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    GRANT

1.1.    Grant of Franchise: As of the Opening Date (as defined below), Franchisor grants Franchisee the right, and Franchisee undertakes the obligation, to operate the Inn as a Red Roof Inn at the Approved Location and to use the System and the Proprietary Marks in compliance with the Standards and the terms of this Franchise Agreement in connection with the ownership and operation of the Inn. Franchisee shall not operate the Inn from or at any other address or location. The "Opening Date" means the date specified in a written notice and signed by an authorized representative of Franchisor as the approved date on which the Franchisee is permitted to begin operating as a Red Roof Inn. Franchisor shall have no obligation to approve an Opening Date until Franchisee has completed the renovation or construction of the Inn in strict accordance with Section 5 of the Franchise Agreement (and, as applicable, the Construction Addendum or the Renovation Addendum attached hereto and incorporated herein (each as defined herein)) and the Franchisor has had a reasonable opportunity to confirm completion by site inspection. If Franchisor approves a conditional opening, as described in the applicable Construction or Renovation Addendum, the approved conditional opening date is the Opening Date.

1.2.    Exclusive Territory: If: (i) neither Franchisee nor any Affiliate is in default under the terms of this Franchise Agreement or any other agreements with Franchisor or its Affiliates and (ii) during the last twelve (12) consecutive months, the Inn has met or exceeded all quality assurance and guest complaint standards published by Franchisor, then Franchisor shall not establish or operate, or grant any other person or entity the right to establish or operate a Red Roof Inn at any location within the geographic area defined in Exhibit A to this Franchise Agreement (the "Exclusive Territory"). This provision shall not apply to any Red Roof Inns in existence as of the date of this Franchise Agreement, as identified in Exhibit A hereto (including any replacement for such location).

1.3.    Limitations of Franchise:

1.3.1. Notwithstanding Section 1.2, Franchisee acknowledges and agrees that Franchisor or its Affiliates may establish or operate, or grant any person or entity the right to establish or operate a Red Roof Inn at any location outside the Exclusive Territory, including locations adjacent, adjoining or proximate to the Exclusive Territory, which may compete directly with the operation of the Inn. Franchisee further acknowledges and agrees that, except as specifically provided in Section 1.2, Franchisor and its Affiliates have and retain the right to engage in any business activities, under any name, at any location, without granting Franchisee any right therein, including, without limitation, the right to establish or operate, and to grant others the right to establish or operate, inns, motels, hotels and other lodging facilities (including, without limitation, extended stay, limited service, full service, resort, economy, luxury, and ultra-luxury facilities) under marks and names similar to or different from the Proprietary Marks at any location, including locations within, adjacent, adjoining or proximate to the Exclusive Territory.

1.3.2. Franchisee acknowledges that Franchisor and its Affiliates have and may have business interests other than the operation of the network of Red Roof Inns and that they, in their sole discretion, may identify, define, and act upon such interests in the manner they deem appropriate.  Franchisee further acknowledges that business decisions made by Franchisor and its Affiliates may impact Franchisee, agrees that Franchisor and its Affiliates have no express obligation or implied duty to protect Franchisee from the consequences of such business decisions, and expressly waives any right to assert any claim against Franchisor or its Affiliates based on the existence, actual or arguable, of any such obligation or duty.

2.    TERM

2.1.    Initial Term:  The initial term of this Franchise Agreement shall commence on the date that this Franchise Agreement is accepted and executed by Franchisor in Columbus, Ohio (the "Effective Date") and shall expire on the Expiration Date, as shown on Exhibit A to this Franchise Agreement (the "Expiration Date"), unless sooner terminated in accordance with the provisions hereof.

2.2.    Renewal:  If Franchisee desires to renew this franchise for one additional period of ten (10) years, Franchisee shall submit a renewal application to Franchisor not less than twelve (12) months nor more than eighteen (18) months before the end of the initial term.  Upon receipt of Franchisee's renewal application, Franchisor shall have the right, in its reasonable discretion, to preliminarily approve or disapprove Franchisee's application. Franchisor shall notify Franchisee of its preliminary decision, in writing, not less than nine (9) months before the end of the initial term.  Notwithstanding Franchisor's preliminary approval, Franchisee's right and Franchisee's obligation to renew this franchise is expressly subject to Franchisee's continuing compliance with the following terms and conditions:

2.2.1.    Upon the expiration of the initial term, Franchisee shall not then be in default of any provision of this Franchise Agreement, including any amendments or replacements hereof, or any other agreement between Franchisee and Franchisor, including any other franchise agreement, or in default of any agreement with Franchisor's approved or designated suppliers, and Franchisee shall have substantially complied with all the terms and conditions of such agreements during their respective terms.

2.2.2.    Upon the expiration of the initial term, Franchisee shall have satisfied all monetary obligations owed by Franchisee to Franchisor and to all approved or designated suppliers to the Inn and shall have met these obligations on a timely basis throughout the term of this Franchise Agreement.

2.2.3.    Not less than six (6) months before the end of the initial term, as a condition to renewal, Franchisee shall, among other things: (i) cause the Manager, as that term is defined in Section 5.5, below, and any other employees designated by Franchisor to comply with Franchisor's then-current training requirements and (ii) agree to upgrade the Inn (and sign an agreement that Franchisor prepares to document such obligation), at Franchisee's expense, to conform to Franchisor's then-current Standards and specifications, including, without limitation, such structural changes, remodeling, redecoration, and modifications to existing improvements as may be required by Franchisor. All such training requirements and upgrades shall have been completed, to Franchisor's sole satisfaction, upon the expiration of the initial term.

2.2.4.    Franchisee and Franchisee's owners shall execute a general release of any and all claims that Franchisee, the owners or their Affiliates may have, have had, or may have in the future against Franchisor and Franchisor's Affiliates and the officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of Franchisor and Franchisor's Affiliates, past or present, in their corporate and individual capacities, including, without limitation, claims arising under this Franchise Agreement or under federal, state or local laws, rules, regulations or orders, related to acts, omissions  or claims which arose or accrued before the date of the renewal.

2.2.5.    Franchisee shall execute Franchisor's then-current franchise agreement and then-current ancillary agreements for the ten (10) year renewal term. If the renewal is approved by Franchisor, such renewal franchise agreement shall supersede in all respects this Franchise Agreement and the terms thereof may differ from the terms of this Franchise Agreement including, without limitation, different royalty and marketing and reservation fees.

2.2.6.    Franchisee shall pay a renewal fee in an amount equal to fifty percent (50%) of Franchisor's

3

then-current initial franchise fee.

3.   DUTIES OF FRANCHISOR

3.1.   Assistance by Franchisor:  In addition to the other duties and obligations set forth in this Franchise Agreement, Franchisor shall:

3.1.1.   Make training programs available to Franchisee on the terms and conditions set forth in Section 5.6. Franchisor may provide continuing training, consultation and advisory assistance to Franchisee in the management, operation and marketing of the Inn in the manner, at such times, and upon such other terms and conditions (including, but not limited to, fees payable for such assistance) as Franchisor deems advisable.

3.1.2.   Provide Franchisee, on loan, one (1) hard copy set of the Manuals, or make such Manuals available in electronic form, accessible by Franchisee.

3.1.3.   Provide for a system for receiving and transmitting guest reservations for stays at Red Roof Inn locations, including without limitation all software, equipment, communications facilities, personnel and services for the operation of the system (the "Reservation System"). The Reservation System may be operated by Franchisor, an Affiliate of Franchisor or a third party supplier of Franchisor's choosing, as provided in the Manuals or otherwise in writing.

3.1.4.   Publish a directory of Red Roof Inn locations and information concerning Red Roof Inn services for guests (the "Directory") periodically.

3.1.5.   Designate for Franchisee the computer and data communication hardware, software, and communications facilities and services ("Computer System") to be used in connection with operating a Red Roof Inn.

3.2.   Delegation by Franchisor:  Franchisee acknowledges and agrees that any duty or obligation imposed on Franchisor by this Franchise Agreement (including any duty or obligation under Section 3.1) and any right or power conferred on Franchisor may be performed or exercised, at Franchisor's discretion, by any designee, employee, supplier, contractor or agent of Franchisor, which may include Affiliates, as Franchisor may approve or designate.  Such persons may be referred to as "approved or designated suppliers."

4.   FEES

4.1.   Initial Franchise Fee: As part of the consideration for the franchise granted herein, Franchisee shall pay to Franchisor an initial franchise fee in the amount of Twenty-Seven Thousand Dollars ($27,000) (the "Initial Franchise Fee") on or before the Effective Date of this Franchise Agreement. The Initial Franchise Fee is in addition to any application fee paid to Franchisor as part of the application process. The Initial Franchise Fee is fully earned and non-refundable in consideration of the administrative and other expenses incurred by Franchisor in entering into this Franchise Agreement and for Franchisor's lost or deferred opportunity to franchise others within the Exclusive Territory.

4.2.   Royalty Fee: As further consideration for the franchise granted by this Franchise Agreement, Franchisee shall pay to Franchisor a monthly royalty fee as set forth below (the "Royalty Fee").

4.2.1. Commencing with the calendar month in which the Opening Date occurs and continuing through the calendar month in which the Expiration Date occurs, Franchisee shall pay to Franchisor a monthly Royalty Fee in an amount equal to four and one-half percent (4.5%) of the Inn's Gross Room

4

Revenues. "Gross Room Revenues" means the gross receipts whether collected or uncollected, attributable to or payable for the rental of guest rooms at the Inn, including, without limitation, the gross revenues used in calculation of business interruption, rent loss, or similar insurance with respect to the Inn (provided that insurance proceeds shall be included in Gross Room Revenues only to the extent actually received or due). Gross Room Revenues shall not include gratuities to employees or service charges levied in lieu of such gratuities, which, in either case, are payable to employees, or federal, state and local taxes or fees collected by Franchisee for transmittal to the appropriate taxing authorities. Gross Room Revenues shall not be reduced by credit card commissions, bad debts (or reserves for bad debts) or refunds to lodgers.

4.2.2. If: (i) for any full twelve (12) month period designated by Franchisor (the "Rebate Period") the Inn achieves superior results, as determined by and in the sole discretion of Franchisor, using a guest satisfaction tracking system conducted or commissioned by Franchisor for the purpose of determining the satisfaction of guests at Red Roof Inns, or any other such program that Franchisor might use in its sole discretion to measure guest satisfaction and (ii) Franchisee is not in default of its obligations under this Franchise Agreement (including, but not limited to, financial obligations), or any other agreement between Franchisor and Franchisee, then Franchisor will rebate to Franchisee an amount equal to one-ninth of the Royalty Fee paid by Franchisee with respect to the Rebate Period pursuant to Section 4.2.1. Thus, if the Franchisee has paid four and one-half percent (4.5%) of the Inn's Gross Room Revenues under Section 4.2.1, one-half percent (0.5%) of the Inn's Gross Room Revenues for the Rebate Period will be rebated to the Franchisee. The Inn must be open and operating as a Red Roof Inn during the entire Rebate Period to be eligible for such rebate. Such rebate, if any, will be paid to Franchisee within ninety (90) days following the end of the Rebate Period to which the rebate relates.

4.3.    Marketing and Reservation Fee:  Commencing with the calendar month in which the Opening Date occurs and continuing through the calendar date in which the Expiration Date occurs, Franchisee shall pay to Franchisor a monthly marketing and reservation fee (the "Marketing and Reservation Fee") in an amount equal to four percent (4%) of the Inn's Gross Room Revenues for the preceding calendar month. The monthly Marketing and Reservation Fee shall be subject to increase from time to time upon notice by Franchisor; provided, that the Marketing and Reservation Fee shall not increase more than one half percent (0.5%) of Gross Room Revenues in any twelve (12) month period, nor shall the Marketing and Reservation Fee exceed a maximum of five percent (5.0%) of Gross Room Revenues.

4.4.    Preferred Members Program:  Franchisee must participate in any guest loyalty programs that Franchisor may initiate and amend from time to time at its sole discretion (a "Preferred Members Program"), including, but not limited to, the "RediCard" Preferred Member Program.  Such programs include but are not limited to providing guests with express check-in, guaranteed late check-in and the opportunity for guests to earn free room nights at Red Roof Inns. Franchisee shall pay to the Franchisor four percent (4.0%) of Gross Room Revenues that are generated by the Preferred Members Program (the "Preferred Members Program Fee").  The Preferred Members Program Fee shall be subject to increase from time to time upon notice by Franchisor; provided that the Preferred Members Program Fee shall not exceed five percent (5.0%) of Gross Room Revenues that are generated by the Preferred Members Program.

4.5.    Other Fees:  Franchisee must reimburse Franchisor or its approved or designated suppliers for the amounts of any travel agency commissions, airline reservation system fees, fees associated with the use of other electronic booking systems by guests and other related fees that Franchisor pays to third parties on Franchisee's behalf in connection with reservations for rooms at the Inn ("Booking Fees and Commissions").  Additionally, Franchisee shall comply with any terms of such programs. Franchisee acknowledges that the Booking Fees and Commissions may, in the future, be directly invoiced to Franchisee by one or more third-party billing clearinghouses, which may charge Franchisee an additional administrative or related fee for their services.

4.6. Late Payment: Franchisee shall be invoiced for all fees payable under this Section 4. In the event Franchisee fails to pay an invoice by the due date stated therein, Franchisor shall have the right, in its sole discretion, to impose a late fee of fifty dollars ($50) and charge interest in an amount equal to the lesser of (a) eighteen percent (18%) interest per annum or (b) the maximum rate permitted by law. Further, Franchisor reserves the right to impose a returned check fee, payable upon demand, if Franchisee's check for any payments due under this Franchise Agreement fails to clear.

4.7. Form of Payment: All sums payable by Franchisee to Franchisor or its approved or designated suppliers under this Franchise Agreement shall be paid as Franchisor may from time to time specify in writing. Franchisor may direct that all monthly payments required under this Section be made to a bank account designated by Franchisor by wire transfer, by automated clearinghouse (ACH) transfer, or by other means which Franchisor may specify from time to time.

5. <u>DUTIES OF FRANCHISEE</u>

5.1. Construction/Renovation/Maintenance of the Inn:

5.1.1. Prior to the Opening Date, Franchisee shall, at Franchisee's expense, construct, convert, equip and furnish the Inn in accordance with the provisions of this Franchise Agreement and as applicable, the Construction Addendum or the Renovation Addendum. Except for Franchisee's own uses related to its operation of the Inn, Franchisee shall not reproduce, use, or permit the use of, any of Franchisor's design concepts, drawings, or specifications, without Franchisor's prior written consent.

5.1.2. At any time after the Opening Date, at Franchisor's request, Franchisee shall, at Franchisee's expense, make Short-Term Renovations to the Inn. "Short-Term Renovations" means upgrades, refurbishments and renovations, which include but are not limited to such items as damaged or deteriorated carpet, drapes, bedspreads, paint and case goods. Additionally, at Franchisor's request, which shall not be made more often than once every five (5) years during the term of this Franchise Agreement, Franchisee shall, at Franchisee's expense, make Long-Term Renovations to the Inn to conform the Inn to the then-current Standards for facilities then entering the System. "Long-Term Renovations" are those upgrades, refurbishments and renovations which constitute capital improvements and include, without limitation, such items as interior/exterior structural changes, shower and tub combinations, vanities, roofs and parking lots.

5.1.3. Throughout the term of the Franchise Agreement, Franchisee shall maintain the Inn in good repair and in a condition consistent with the Standards and shall make such additions, alterations, repairs and replacements as may be required for that purpose (but no others without Franchisor's written consent), including, without limitation, periodic repainting and replacement of signs, equipment, furnishings and furniture in accordance with the Standards.

5.2. Maintaining Franchisor's Image: Franchisee acknowledges that every detail of the System is important to Franchisor and other franchisees operating under the System in order to develop and maintain the Standards and public image of the System, to protect Franchisor's reputation and goodwill, and to increase the demand for the lodging services offered by Red Roof Inns. Franchisee agrees to comply with the Standards and not to deviate from them. Franchisee shall not operate the Inn in any manner which Franchisor reasonably believes adversely reflects on Franchisor, the System, the Proprietary Marks, the associated goodwill, or Franchisor's rights therein. Franchisee shall not, directly or indirectly, operate any business, at the Approved Location or otherwise, which violates this Section 5.2.

5.3. Products and Services: Franchisee shall offer only such goods and services at the Inn as are from

time to time specifically approved by Franchisor in writing.

5.4.    Business Operations:  Franchisee shall operate the Inn twenty-four (24) hours a day, every day, except as otherwise approved in writing by Franchisor. Franchisee shall use the Approved Location solely for the operation of the Inn, and shall not permit the use of the Approved Location for any other purpose or activity at any time without Franchisor's prior written consent.

5.5.    Designated Manager:  Before the Opening Date, and at all times during the term of this Franchise Agreement, Franchisee shall designate a person who must devote his or her full time, best efforts to managing the Inn, who may, but need not, be an owner of Franchisee and who shall have authority over the day-to-day operations of the Inn (the "Manager").

5.6.    Training:

5.6.1.    Before the Opening Date, Franchisee or Franchisee's Manager must attend and successfully complete to Franchisor's satisfaction, Franchisor's RED Advantage Training Program, unless otherwise approved by Franchisor in writing.  Franchisee shall pay Franchisor's then-current fee for the RED Advantage training program. For each replacement or substitute Manager, Franchisee hires subsequent to the initial Manager, Franchisee shall: (i) cause each such Manager to attend and successfully complete, to Franchisor's satisfaction, Franchisor's RED Advantage training program within a reasonable period of time (not to exceed two (2) months) after commencing his or her duties as Manager; and (ii) pay Franchisor the then-current training fee for the RED Advantage training program.

5.6.2.    Before the Opening Date, Franchisor or its approved or designated suppliers shall conduct at the Inn (i) a one (1) to three (3) day initial training program for Franchisee's employees, at Franchisee's expense, to prepare them to operate, administer, and manage the Inn in compliance with Franchisor's Standards and (ii) Computer System training. Franchisee shall pay the then-current fee for such training and shall reimburse Franchisor or its approved or designated suppliers for the cost of the trainers' travel, out-of-pocket expenses, meals and lodging, as well as the cost of shipping computer training equipment to the Inn.

5.6.3. Franchisor may require Franchisee and its employees to attend other training courses, programs, conferences (including annual conferences) and seminars at such locations as Franchisor may designate ("Ongoing Training"). Franchisee shall pay the then-current fee for any Ongoing Training and shall be responsible for all expenses incurred by its participants (including, but not limited to, the costs of transportation, meals, lodging and wages or salary and benefits).  Franchisor reserves the right to impose a fee for Franchisee's failure to attend Ongoing Training.

5.7.    Guest Room Count:  The Inn shall consist of the number of guest rooms specified in Exhibit A. Franchisee shall not increase or decrease the number of guest rooms in the Inn without the prior written consent of Franchisor.  Franchisor may impose reasonable conditions on its consent to an increase or decrease in the number of guest rooms, including, without limitation, the following:

5.7.1.    Franchisee shall demonstrate to Franchisor's reasonable satisfaction that the Inn, as altered, will continue to meet the then-current Standards; and

5.7.2.    In the case of a proposed decrease in the number of guest rooms, Franchisee shall demonstrate to Franchisor's reasonable satisfaction that the number of guest rooms remaining after the decrease are sufficient to serve the Exclusive Territory.

5.8.    Supplies/Fixtures/Equipment/Designated and Approved Suppliers:

7

5.8.1.  Franchisee shall purchase and install and use at the Inn, at Franchisee's expense, all fixtures, furnishings, equipment, decor items (including signs, posters and other property identification items) and supplies as may be required by Franchisor, which may be amended from time to time, in writing, in the Manual or through other written communications. In no event shall Franchisee, without Franchisor's prior written consent, use, install or permit to be installed in, on or about the Inn, any fixtures, furnishings, equipment, signs or other items not meeting the Standards.

5.8.2.  Upon notice from Franchisor, Franchisee shall purchase any or all such items solely from suppliers who have been listed by Franchisor as approved or designated suppliers in the Manuals or otherwise in writing. Franchisor reserves the right to approve or designate a single supplier of certain items in order to promote compliance with the Standards.

5.8.3.  If Franchisee desires to purchase any items from a supplier not designated as an approved or designated supplier, then Franchisee shall submit to Franchisor a written request to approve the proposed supplier, together with such evidence of the supplier's qualifications as Franchisor may reasonably require. Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered for evaluation and testing to Franchisor or to an independent testing facility designated by Franchisor. A charge, not to exceed the reasonable cost of the evaluation and testing, shall be paid by Franchisee whether or not the supplier is approved. After completion of such evaluation and testing (if required by Franchisor), Franchisor shall notify Franchisee in writing of its approval or disapproval of the proposed supplier. Approval shall not be unreasonably withheld. Franchisee shall not purchase any products or services from the proposed supplier until Franchisor's written approval of the proposed supplier is received.

5.8.4.  Franchisor may from time to time revoke its designation or approval of particular products or suppliers if Franchisor determines, in its sole discretion, that such products or suppliers no longer meet the Standards or no longer are able to meet the System's needs. Upon receipt of a written notice of revocation, Franchisee shall immediately cease to offer or sell any disapproved products and shall cease to purchase from any disapproved supplier.

5.8.5.  Except as otherwise specifically approved by Franchisor in writing, Franchisee agrees that it will use products purchased from approved suppliers solely for the purpose of operating the Inn and not for any other purpose, including, without limitation, for resale.

5.9.  Signage/Display of Proprietary Marks:  Franchisee shall prominently display in and upon the premises of the Inn such signs as are required by Franchisor in the Manuals or as otherwise directed or approved by Franchisor from time to time in writing, including, without limitation, signs bearing the Proprietary Marks. All such signs shall be of a nature, and shall be in the form, color, number, location, size and content as specified by Franchisor in the Manuals or otherwise in writing. Franchisee shall comply with the Standards concerning the types of services and products that may be promoted or advertised at the Inn, including those Standards relating to the display of promotional materials. Franchisor reserves the right at any time to require, and Franchisee agrees to conform to, any change in or presentation of the Proprietary Marks.

5.10.  Employee Relations/Guest Relations:

5.10.1.  Franchisee shall be solely responsible for all employment decisions and functions at and for the Inn, including, without limitation, those related to hiring, firing, training, wage and hour requirements, payment and provision of wages, salaries and fringe benefits, record-keeping, supervision and discipline. Franchisee further acknowledges and agrees that Franchisee shall be solely responsible for the acts and omissions of its employees. Franchisee shall specify on all employment applications used at

the Inn that Franchisee is the sole employer of the Inn's employees and that there exists no employment relationship between Franchisor and any such employee.

5.10.2. Franchisee shall take such steps as are necessary to ensure that its employees preserve good guest relations, render competent, prompt, courteous and knowledgeable service, and meet the Standards.

5.10.3. Franchisee shall comply with Franchisor's policies and procedures set forth in the Manuals concerning guest relations and guest complaints. If Franchisee fails to resolve a guest complaint in accordance with Franchisor's policies, Franchisee shall be required to (a) reimburse Franchisor for any expenses incurred by Franchisor to resolve the guest complaint and (b) pay Franchisor a guest relations intervention fee if Franchisor communicates with the guest or otherwise intervenes or takes action to resolve the complaint. The guest relations intervention fee shall be as set forth in the Manuals, which fee may be modified by Franchisor from time to time.

5.11. Compliance with Laws: Franchisee shall (i) comply with all federal, state and local laws, rules, regulations, and ordinances, including but not limited to laws regarding public accommodation, occupational health and safety, labor, insurance, advertising, health and sanitation, innkeepers laws, telephone charges, data security and privacy legislation and (ii) timely obtain any and all permits, certificates and licenses necessary for the full and proper development and operation of the Inn, including, without limitation, licenses to do business, trade, fictitious or assumed name registrations, building permits, sales tax permits, health and sanitation permits and ratings, and fire clearances. Franchisee shall be solely responsible for and Franchisor shall have no responsibility for architecture or engineering, for code, zoning, or other requirements of the laws, rules, regulations or ordinances of any state, local municipality, urban community, or provincial or federal governmental body, including any errors, omissions, or discrepancies of any nature in any drawings or specifications obtained by Franchisee, including those provided by Franchisor. Without limiting the foregoing, Franchisee shall be solely responsible for compliance with any requirements of the Americans with Disabilities Act. Franchisee shall provide proof of compliance herein as Franchisor may require.

5.12. Risk of Litigation:

5.12.1. Franchisee shall promptly report to Franchisor all incidents involving safety, security, public relations or serious injury to persons or property that occur at, or involve, the Inn and shall consult with Franchisor before speaking to or corresponding with the media about any such incident. Franchisee shall otherwise comply with those portions of the safety, security and public relations provisions as designated by Franchisor in the Manual. Notwithstanding the foregoing, Franchisee acknowledges and agrees that it is Franchisee's sole responsibility to maintain the safety and security of its employees, guests and others who may be on the Inn premises.

5.12.2. Franchisee shall, within five (5) days of its receipt thereof, forward to Franchisor copies of all inspection reports, warnings, certificates, letters and ratings issued by any governmental authority, agency or instrumentality during the term of this Franchise Agreement in connection with the operation of the Inn, which indicate (i) Franchisee's failure to meet or maintain the Standards or (ii) less than full compliance with any applicable law, rule, regulation, or ordinance.

5.12.3. Franchisee shall notify Franchisor in writing within five (5) days after the commencement of any action, suit, or proceeding, and thereafter upon the issuance of any order, writ, injunction award or decree, of any court, agency or other governmental authority or instrumentality relating to the Inn (and provide a copy of such).

5.13. Inspection: Franchisee shall permit Franchisor and its agents to enter upon the premises of the Inn

9

at any time for the purpose of conducting inspections or evaluations, and Franchisee shall provide Franchisor's representatives with lodging, without charge, during such evaluations. If the inspection reveals deficiencies in the operation of the Inn or Franchisee's failure to conform to the Standards, as determined in Franchisor's sole discretion, Franchisee shall: (i) upon the written request of Franchisor or its agent, take such steps as may be necessary to correct such deficiencies within the time specified by Franchisor and (ii) provide Franchisor's representatives with lodging, without charge, and reimburse Franchisor for the travel expenses incurred by such representatives in subsequent evaluations to determine whether all deficiencies have been corrected.

5.14. Reservation Service: Franchisee acknowledges and agrees that offering the public a single, efficient, reservation referral service is essential to the goodwill, reputation and success of the System. Franchisee agrees to participate during the term of this Franchise Agreement in any Reservation System maintained or designated by Franchisor for the System and to comply with all terms and conditions of participation. Franchisee shall purchase, install and maintain at the Inn all equipment necessary for participation in the Reservation System, including any required reservation terminal and related equipment and any future enhancements, additions, substitutions or other modifications specified by Franchisor in the Manuals or otherwise in writing. Franchisee shall be responsible for telephone line charges, data communication equipment and services, and other charges to connect Franchisee's equipment to the Reservation System, for the cost of supplies used in the operation of the equipment, and for all other related expenses necessary to the operation of the Reservation System.

5.15. Directory: Franchisee shall list the Inn in each edition of the Directory and shall timely furnish to Franchisor in writing such information as Franchisor may request for that purpose, including, but not limited to, the Inn's then-current room rate. Failure to timely respond to Franchisor's request for Directory information may result in Franchisee's Inn not being listed in the Directory and, in such event Franchisee agrees that neither Franchisor nor Franchisor's Affiliates shall be liable for any such omission. Franchisee shall not engage in any rate practices which tend to mislead the public in any way.

5.16. Programs: Franchisee shall participate in and comply with the terms of all marketing, reservation service, rate and room inventory management, advertising and operating programs and policies required by Franchisor for the System (including, without limitation, any internet-based or other electronic advertising and marketing conducted and prescribed by Franchisor), in the manner directed by Franchisor in the Manuals or otherwise in writing. Such programs and policies may include, without limitation, a "Kids Stay Free" policy, Preferred Member Programs, corporate programs, any other billing and/or controlled spending card program, voucher program, guest satisfaction program, pay-per-view program, pet friendly policy and all other programs designated by Franchisor that do not violate the laws of the state/locality in which the Inn is located. Franchisor may also establish and coordinate advertising, marketing and sales programs, guest satisfaction programs and other activities among System inns, including inns owned or operated by its Affiliates, on a local or regional basis and Franchisee shall participate in and comply with such programs and activities on the same basis as other participating Red Roof Inns in the same region as the Inn.

5.17. Computer System: Franchisee shall purchase or license, install, utilize and maintain at the Inn, at its sole cost, the Computer System and any upgrades or improvements to or replacements for it, as designated from time to time by Franchisor. The Computer System shall include, but not be limited to, computers, printers, monitors, keyboards, communication lines and equipment, and credit card readers, property management software, any other guest check-in, reservation, revenue and other statistical reporting systems, other software necessary to utilize the services, and any third-party computer services designated from time to time by Franchisor in the Manuals. The foregoing obligation shall include any enhancements, additions, substitutions or other modifications to the Computer System or any component of the Computer System that may be required from time to time. Franchisee shall be responsible for all costs incurred in fulfilling its obligations hereunder, including, without limitation, purchase and installation of hardware and software, data circuit charges, charges for connecting Franchisee's equipment to Franchisor's office, the cost of supplies used in the operation of the equipment,

maintenance and support services, and for other related expenses. In furtherance of its obligation hereunder, Franchisee shall, (i) upon execution of this Franchise Agreement, execute and deliver to Franchisor a RediStay™ Property Management Software Sublicense Agreement (the "Software Agreement") related to the proprietary RediStay™ software, and fully comply with all of its obligations under such Software Agreement throughout its term; and (ii) not later than ninety (90) days before the anticipated Opening Date, make application through Franchisor for a data circuit, as specified by Franchisor, for communication between the Computer System and Franchisor's Reservation System and network. Franchisee shall install the data circuit not later than thirty (30) days before the anticipated Opening Date. Franchisee may not open before the approved installation of the Computer System, including the data circuit. . Notwithstanding the foregoing, Franchisee shall not purchase, install, utilize or maintain any computer software, hardware or other telecommunications line that has not been previously approved in writing by Franchisor.

    5.18.   Taxes:

        5.18.1.    Franchisee shall promptly pay when due all taxes levied or assessed by any federal, state or local tax authority, and any and all other indebtedness incurred by Franchisee in connection with the operations of the Inn. Franchisee shall pay to Franchisor an amount equal to any sales tax, gross receipts tax, or similar tax imposed on Franchisor or its Affiliates with respect to any payments to Franchisor or its Affiliates required under this Franchise Agreement.

        5.18.2.    In the event of any *bona fide* dispute as to liability for taxes assessed or other indebtedness, Franchisee may contest the validity of the amount of the tax or indebtedness in accordance with the procedures of the taxing authority or applicable law, provided that such action does not result in any liability to or assessment of, any fine, penalty, or fee against, Franchisor; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the Inn, any part thereof, or any of its assets.

        5.19.   Casualty: If at any time during the term of this Franchise Agreement the Inn is damaged by fire or other casualty and the cost to repair such damage is reasonably estimated to be not more than fifty percent (50%) of the fair market value of the Inn, Franchisee shall expeditiously repair the damage. If the reasonable estimated cost to repair the damage exceeds such amount, Franchisee shall immediately notify Franchisor and shall elect, by written notice to Franchisor delivered within sixty (60) days following the date of the casualty, to repair or rebuild the Inn in accordance with the Standards or to terminate this Franchise Agreement. Any such notice of termination shall be effective sixty (60) days after receipt of the notice by Franchisor. If Franchisee elects to repair the damage, Franchisee shall commence reconstruction within six (6) months after the date of the casualty, shall expeditiously continue with such reconstruction on an uninterrupted basis and, subject to Franchisor's inspection and final approval, shall reopen the Inn for continuous business operations as soon as practicable, but in any event within eighteen (18) months after closing of the Inn, giving Franchisor four (4) weeks' advance notice of the date of reopening. Franchisor shall have the right to terminate this Franchise Agreement by written notice to Franchisee if Franchisee fails to reconstruct the Inn and recommence operations in accordance with the time periods specified in this Section and the Standards. If Franchisee elects to repair damages done to the Inn pursuant to this Section, Franchisor reserves the right to require Franchisee to repair/renovate/rebuild both the damaged and undamaged portions of the Inn to then-current Standards.

6.    <u>PROPRIETARY MARKS</u>

    6.1.   Use by Franchisee: Unless otherwise approved in writing by Franchisor, Franchisee shall:

        6.1.1.    Use the Proprietary Marks only on and after the Opening Date.

6.1.2.    Use only the Proprietary Marks designated by Franchisor and shall use them only in the manner authorized by Franchisor.  Any unauthorized use thereof shall constitute an infringement of the rights of Franchisor and its Affiliates owning rights in the Proprietary Marks.

6.1.3.    Use the Proprietary Marks only for the operation of the Inn at the Approved Location.

6.1.4.    Not use the Proprietary Marks to incur any obligation or indebtedness on behalf of Franchisor or its Affiliates.

6.1.5.    Not use the Proprietary Marks as part of its corporate or other legal name nor shall Franchisee use the Proprietary Marks as part of its domain name except as permitted by and subject to Franchisee's strict compliance with Franchisor's Internet Style Guide and Manuals, as amended from time to time.

6.1.6.    File and maintain the requisite trade, fictitious or assumed name registrations, and shall execute any documents, in each case as deemed necessary by Franchisor to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

6.1.7.    Identify itself as the owner of the Inn, and a franchisee of the Red Roof Inn System, in conjunction with any use of the Proprietary Marks, including, but not limited to, on stationery, invoices, order forms, receipts, business cards, and contracts, and at such conspicuous locations on the Inn premises as Franchisor may direct in writing.

6.2.    Exclusive Property of Franchisor:  Franchisee acknowledges and agrees that:

6.2.1. Franchisor or its Affiliate is the owner of all right, title and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them, and Franchisor has the exclusive right to use, and to license others to use, the Proprietary Marks in connection with the franchising, promotion and development of the System.

6.2.2.    The Proprietary Marks are valid and identify the System and Red Roof Inns operating thereunder.

6.2.3.    During the term of this Franchise Agreement and after its expiration, Franchisee shall not directly or indirectly contest the validity of the Proprietary Marks, Franchisor's (or Franchisor's Affiliates') ownership, exclusive right to use and license others to use the Proprietary Marks or the ownership of the Proprietary Marks by Franchisor or its Affiliate.

6.2.4.    Franchisee's use of the Proprietary Marks pursuant to this Franchise Agreement does not give Franchisee any ownership or other interest in or to the Proprietary Marks.

6.2.5.    Any and all goodwill arising from Franchisee's use of the Proprietary Marks in the operation of its Inn under the System shall inure exclusively to the benefit of Franchisor and its Affiliates, and upon expiration or termination of this Franchise Agreement, no monetary amount shall be attributed to any goodwill associated with Franchisee's use of the System or the Proprietary Marks.

6.2.6.    Franchisor reserves the right, in its sole discretion, to substitute different Trademarks or service marks for the Proprietary Marks for use in identifying the System and the facilities operating under the System. Franchisee agrees to comply promptly in connection with any such substitution, at Franchisee's expense.

6.2.7 Franchisor has sole discretion over any secondary designations by which the Inn will or may be identified. If the Inn is to be identified with a secondary designation of any kind Franchisee shall obtain written approval from Franchisor before utilizing any such secondary designation. Franchisor maintains sole discretion over said designations and may at any time during the term of the agreement change said designation provided that the Inn's name shall always include the name of the brand. Franchisee shall not identify the Inn with any intellectual property rights, brand, name or generic designation (such as by way of example only "Conference Center", "Resort" or "Spa") or any demand generator or geographic descriptor (such as by way of example only "East", "West", "North", "South", "University" or "Airport") without Franchisor's approval. Franchisor has sole discretion over this determination.

6.3.    Infringement by Others:

6.3.1. Franchisee shall promptly notify Franchisor of any unauthorized use of the Proprietary Marks or marks confusingly similar to the Proprietary Marks and any challenge to (i) the validity of the Proprietary Marks, (ii) the ownership of or exclusive right to use and license the Proprietary Marks by Franchisor or its Affiliate, (iii) Franchisor's right to use and to license others to use the Proprietary Marks, or (iv) Franchisee's right to use the Proprietary Marks. Franchisee acknowledges that Franchisor and its Affiliate have the sole right to initiate, direct and control any administrative proceeding or litigation involving the Proprietary Marks, including any settlement thereof. Franchisor and its Affiliate have the right, but not the obligation, to take action against uses by others that may constitute infringement of the Proprietary Marks.

6.3.2. Franchisor shall defend Franchisee against any third-party claim, suit or demand which alleges that Franchisee's use of the Proprietary Marks infringes the rights of such third party, provided that Franchisee has used the Proprietary Marks in accordance with this Franchise Agreement, the Standards, the Manuals and other instructions issued by Franchisor from time to time. If Franchisor, in its sole discretion, determines that Franchisee has used the Proprietary Marks in accordance with the foregoing requirements, the cost of Franchisee's defense, including the cost of any judgment or settlement, shall be borne by Franchisor, and Franchisor shall be entitled to use its counsel of choice. If Franchisor, in its sole discretion, determines that Franchisee has not used the Proprietary Marks in accordance with such requirements, the cost of Franchisee's defense, including the cost of any judgment or settlement, shall be borne by Franchisee.

6.3.3. In the event of any litigation or administrative proceeding relating to the Proprietary Marks, Franchisee shall execute any and all documents and do all acts that may, in the opinion of Franchisor, be necessary or appropriate to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action. Except to the extent that such litigation is the result of Franchisee's use of the Proprietary Marks in a manner inconsistent with the terms of this Franchise Agreement, Franchisor agrees to reimburse Franchisee for its out-of-pocket costs for such acts.

7.    MANUALS

7.1.    Business Operations: In order to protect the reputation and goodwill of the Franchisor and to maintain uniform standards of operation under the Proprietary Marks, Franchisee shall conduct its operations hereunder in accordance with the Manuals.

7.2.    Confidentiality: Franchisee shall at all times treat the Manuals and the information contained therein as confidential and shall use all reasonable efforts to maintain the confidentiality thereof, in accordance with Section 8 of this Franchise Agreement. The Manuals shall remain at all times the sole property of Franchisor (or its approved or designated suppliers if they supply the Manuals) and any hard copies shall be kept in a secure place on the Inn premises. Franchisee shall keep access to electronic copies of the Manuals secure.

7.3.    Modification:  Franchisor shall have the right to add to or otherwise modify the Manuals from time to time.  Franchisee shall ensure that any hard copy of the Manuals in Franchisee's possession is kept up-to-date. In the event of any dispute as to the content of the Manuals, the terms of the master copies of the Manuals maintained by Franchisor at Franchisor's home office shall control.

8.    <u>CONFIDENTIAL INFORMATION</u>

8.1.    Franchisor's Confidential Information:   Franchisee acknowledges that, pursuant to this Franchise Agreement, it will receive valuable Confidential Information. Franchisor's "Confidential Information" means the proprietary property management software, the Manuals (including all supplements and revisions thereto), any other manuals issued for use in connection with the establishment and operation of Red Roof Inns, and any and all other materials, information, procedures, techniques or data which Franchisor (or as the case may be its approved or designated supplier) provides (including, without limitation, the site selection, operational, sales, promotional, and marketing methods and techniques of the System), except information which Franchisee can demonstrate came to Franchisee's attention by proper means before disclosure thereof by Franchisor (or as the case may be its approved or designated supplier), or which, at or after the time of such disclosure, had become or later becomes a part of the public domain, through proper publication or communication by others and which does not violate this Franchise Agreement or any agreement Franchisor (or as the case may be its approved or designated supplier) may have with a third party.

8.2.    Use of Franchisor's Confidential Information/Enforcement:

8.2.1.    Franchisee shall not, during the term of this Franchise Agreement or thereafter, misuse, communicate, divulge, or disclose to any third party, or use for the benefit of any other person any Confidential Information, knowledge or know-how concerning Franchisor, the System, or the operation of the Inn, which may be communicated to Franchisee or its owners, or of which Franchisee or its owners may be apprised, by virtue of Franchisee's operation under the terms of this Franchise Agreement. Further, after the termination or expiration of this Franchise Agreement, Franchisee and its owners shall not use the Confidential Information for its or their own benefit and shall surrender all Confidential Information to Franchisor. Franchisee shall not, at any time, without Franchisor's prior written consent, copy, duplicate, record or otherwise reproduce any Confidential Information, in whole or in part. Franchisee shall divulge such Confidential Information only to such of its employees, contractors, architects, lenders, investors, agents or others who must have access to the Confidential Information in connection with the performance of this Franchise Agreement or the operation of the Inn pursuant hereto and who have executed covenants satisfactory to Franchisor to maintain the confidentiality thereof, copies of which shall be submitted to Franchisor at Franchisor's request.

8.2.2.    Franchisee agrees that the existence of any claims it may have against Franchisor or Franchisor's Affiliates, whether or not arising from this Franchise Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section 8.  Franchisee and its owners further acknowledge that any violation of the terms of this Section 8 would result in irreparable injury to Franchisor or its Affiliates for which no adequate remedy at law may be available, and Franchisee and its owners accordingly consent to the issuance of an injunction prohibiting any conduct by them in violation of the terms of this Section 8. Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees and court costs) incurred by Franchisor or its Affiliates in connection with the enforcement of this Section 8, including all costs and expenses for obtaining specific performance, or an injunction against any violation, of the requirements of Section 8.

8.2.3.    At Franchisor's request, Franchisee shall obtain covenants similar in substance to those in

14

this Section 8, in a form acceptable to Franchisor, from any of its owners and from such of Franchisee's officers as Franchisor may require.

      8.2.4. The covenants in this Section 8 shall survive the termination, expiration or transfer of this Franchise Agreement.

    8.3. Franchisee's Confidential Information: Franchisor acknowledges that during the term of this Franchise Agreement it may obtain confidential or proprietary information belonging to or concerning Franchisee and/or the operation of the Inn, through reports provided by Franchisee, inspections or evaluations of the Inn, the Computer System, or other means. Franchisor shall use all reasonable measures to protect Franchisee's confidential or proprietary information, provided that Franchisor shall have the right to use (and to allow its approved or designated suppliers to use) all such Confidential Information in evaluating and administering the System and the operation of individual Red Roof Inns, including Franchisee's Inn, and may disclose such Confidential Information to third parties, including in reports of hotel/motel industry data and franchise earnings claims, provided that unless otherwise required by law, individual franchise or Inn results will be reported without specifically identifying Franchisee or the Inn.

9.     <u>ACCOUNTING AND RECORDS</u>

    9.1. Record Retention: Franchisee shall maintain and preserve, for at least five (5) years from the date of their preparation, complete and accurate books, records, and accounts showing the results of operation of the Inn, in the form and manner prescribed by Franchisor from time to time in the Manuals or otherwise in writing, such requirement to survive termination. In connection with its keeping of such accounts and records, Franchisee, at its expense, shall:

      9.1.1. Install and maintain such equipment or participate in such services (including Computer System), make such arrangements and follow such procedures as Franchisor may require in the Manuals or otherwise in writing, to permit Franchisor to access each night during the term of this Franchise Agreement, from Franchisee's Computer System, information on the occupancy, average daily room rate, rooms sold, Gross Room Revenue, and such other data and information attributable to the Inn as Franchisor may require (the "<u>Reports</u>"). To the extent the Reports for any calendar month or partial calendar month are not furnished to Franchisor by Franchisee's Computer System, as provided herein, Franchisee shall submit such Reports to Franchisor within twenty (20) days following the end of each calendar month.

      9.1.2. Upon Franchisor's request, submit to Franchisor within ninety (90) days following the end of each fiscal year (in the form prescribed by Franchisor): (a) an annual income statement for such fiscal year, and (b) a balance sheet as of the end of such fiscal year. If such statement is audited, a copy of the audited statement, together with the auditor's report, shall be furnished. Each statement shall be signed by an authorized representative of Franchisee attesting that it is true and correct.

      9.1.3. Submit to Franchisor, for review and/or auditing, such other forms, periodic and other reports, records, information, and data as Franchisor may reasonably designate, in the form and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manuals or otherwise in writing. All such reports and information received by Franchisor pursuant to this Franchise Agreement shall be the property of Franchisor, and Franchisor shall have the right to use such information in its reasonable discretion, subject to the limitations set forth in Section 8.3 of this Franchise Agreement, for the benefit of the entire System.

    9.2. Examination by Franchisor: Franchisor or its designated agents shall have the right at any time to examine and copy, at Franchisor's expense, all books, records and tax returns of Franchisee related to the Inn and, at Franchisor's option, to have an independent audit made. Such records shall be made available to Franchisor or

its agents at the Approved Location as soon as practical but not more than three (3) days after Franchisee receives written notice of the request. If all books, records and tax returns of Franchisee related to the Inn are not made available to Franchisor at a scheduled audit; the audit will be deemed failed. If an inspection or audit reveals that Franchisee has failed to pay Franchisor or its approved or designated suppliers any sums required to be paid as provided by this Franchise Agreement, then Franchisee shall immediately pay Franchisor or its approved or designated suppliers the amount of such deficiency, any late fees, and interest from the date such amount was due until paid, as provided in Section 4.6. If an inspection discloses an underpayment to Franchisor of two percent (2%) or more of the total amount that should have been paid to Franchisor or its approved or designated suppliers, Franchisee shall, in addition to payment of such deficiency, with late fees and interest, reimburse Franchisor for any and all costs and expenses incurred in connection with the inspection or audit (including, without limitation, reasonable accounting and attorneys' fees). If Franchisee fails an audit (whether because of a failure to make records available as required above or because the inspection reveals that Franchisee has failed to pay all amounts payable), Franchisor may re-inspect the books and Franchisee shall bear the re-inspection costs. The foregoing remedies shall be in addition to any other remedies Franchisor may have.

10.    MARKETING PROGRAM AND RESERVATION SYSTEM

    10.1.    Use of Marketing and Reservation Fee:

        10.1.1.    Franchisor shall use the Marketing and Reservation Fee received pursuant to Section 4.3 in a manner Franchisor determines, in its sole discretion, to be necessary or appropriate to develop, operate, support or administer a marketing program (the "Marketing Program") including but not limited to (a) marketing, advertising, reservation confirmations, the development of new guests and repeat visits by guests, and systems designed for such purposes (including any and all costs associated with developing, preparing and administering reservation services and developing the specifications for the Computer System, phone lines and phone operations), (b) developing, preparing, producing, directing, administering, conducting, maintaining and disseminating advertising, marketing, telemarketing, promotional and public relations materials, programs and campaigns, (c) developing, preparing, producing, directing, administering, conducting, maintaining, publishing and disseminating the Directory, (d) creating and maintaining internet-based advertising and marketing for the System (through a Red Roof Inn website or otherwise), (e) conducting market research, and (f) developing, operating, supporting and/or administering other marketing programs; as well as developing, operating, supporting and/or administering the Reservation System. The Marketing and Reservation Fee may be applied by Franchisor to defray the reasonable administration costs and overhead costs the Franchisor and/or an Affiliate incurs in providing and/or administering the Reservation System and Marketing Program, including, but not limited to, the cost of providing accounting, collection, bookkeeping, reporting and legal services. Franchisor or an Affiliate may provide products or services to develop, operate, direct, provide and/or administer the Reservation System and Marketing Program. Any such products or services provided by Franchisor or an Affiliate will be provided at a cost comparable to those costs that would have been otherwise incurred if such products or services were obtained from unaffiliated third parties.

        10.1.2.    Franchisee agrees and acknowledges that the Reservation System and Marketing Program are intended to maximize general public recognition, acceptance and use of the System and of Franchisor's brands, and that in administering the Marketing and Reservation Fee Franchisor is not obligated to: make expenditures for Franchisee which are equivalent or proportionate to Franchisee's Marketing and Reservation Fee, spend money on advertising in Franchisee's local area, or to ensure that Franchisee benefits directly or pro rata from expenditures for the marketing and reservation programs.

        10.1.3.    The aggregate of the Reservation and Marketing Fee Franchisor collects from Franchisee and other franchisees in the System does not constitute a trust and Franchisor is not a fiduciary with respect

to such amounts. Franchisor may aggregate the Marketing and Reservation Fees with other funds of Franchisor in one or more accounts in financial institutions and is not obligated to administer the proceeds as a separate fund. However, an unaudited annual report of the receipts and expenditures of the Reservation System and Marketing Program shall be made available to Franchisee upon request.

10.2.    Advertising Done by Franchisee:

10.2.1. In addition to the Marketing and Reservation Fee, Franchisee shall pay the following: (i) all of Franchisee's expenditures for local billboard advertising and other Inn-specific advertising and promotions and (ii) certain special promotion support materials, such as the in-room acrylic holders for promotional materials, point-of-sale or other such materials used to promote the Red Roof Inn System from time to time.

10.2.2. Franchisee may, at Franchisee's expense, conduct local and regional marketing programs and related activities subject to Franchisor's prior written approval; provided, that in no event shall Franchisee advertise, promote, post or list information relating to the Inn available on the internet or other electronic media, except in accordance with Section 10.5 below or as permitted and subject to Franchisee's compliance with the Standards.

10.2.3. Franchisee shall participate in any designated one-time marketing, advertising or quality assurance programs designated or conducted by Franchisor, and pay the cost of participating, subject to the limitations in this paragraph. The amount of Franchisee's required payment shall not exceed two thousand five hundred dollars ($2,500) in the aggregate in the first calendar year in which Franchisor first requires such payments. The cost of participation in subsequent calendar years may be increased by no more than 5% over the previous calendar year requirement.

10.3.    Cooperatives:

10.3.1.    Franchisor shall have the right, exercisable at any time, to require Franchisee to join with Franchisor, its Affiliates and/or other franchisees in a specified geographic area in local and regional cooperative advertising and marketing materials (each, a "Cooperative"). In no event shall Franchisee be required to be a member of more than one Cooperative at a time for each Red Roof Inn operated by Franchisee under franchise agreements with Franchisor.

10.3.2.    Franchisee agrees to be bound by the terms of the Cooperative agreement to be entered into with other franchisees in such Cooperative as may be designated by Franchisor, which may include Red Roof Inn locations owned or operated by Franchisor or by any entity controlled by Franchisor or its Affiliates.

10.3.3.    Franchisee shall contribute to such Cooperative such amounts as are determined by the Cooperative, which shall not be greater than one percent (1%) of the Gross Room Revenues of each inn operated by the members of the Cooperative. The contribution to the Cooperative shall be in addition to, and not in lieu of, the Marketing and Reservation Fee. Each member of the Cooperative shall contribute at the same percentage of its Gross Room Revenues.

10.3.4.    If a Cooperative has been established for the area in which the Inn is located at the time the Inn opens for business, Franchisee shall immediately become a member of the Cooperative. If a Cooperative is established for the area in which the Inn is located during the term of this Franchise Agreement, Franchisee shall become a member no later than thirty (30) days after written notification by Franchisor that the Cooperative has commenced operation.

10.3.5. Franchisee agrees to abide by all rules, regulations and bylaws, which shall be implemented

17

and, as necessary, amended with Franchisor's prior written consent.

     10.3.6.  No advertising or promotional plans or materials may be used by a Cooperative or furnished to its members without Franchisor's prior consent.

    10.4.  Compliance with Standards:  Recognizing the value of advertising and the importance of the standardized advertising programs to the furtherance of the goodwill and public image of the System, Franchisee agrees that all advertising by Franchisee shall be conducted in a dignified manner and shall conform to the Standards and other requirements as Franchisor may otherwise specify in writing. At least fifteen (15) business days before the date on which Franchisee intends to print or record the materials, Franchisee shall submit to Franchisor, for its prior written approval, samples of all proposed advertising and promotional materials for the Inn and a statement of the intended use of each. Any materials that are not in clear violation of Franchisor's published guidelines for form and content, which are submitted to Franchisor and not disapproved in writing within ten (10) business days following the date such materials are received by Franchisor shall be deemed approved. Franchisor may, upon thirty days' prior written notice, revoke its approval of any advertising and promotional materials previously approved or deemed approved, at which point Franchisee shall immediately cease its use of same.

    10.5.  Franchise Website:

     10.5.1.    In the event Franchisor maintains a website that provides information to the public about Franchisor and its franchise systems (including the System and the accommodations and services that Red Roof Inns provide), Franchisor may use the Marketing and Reservation Fee to pay or reimburse the costs associated with the development, maintenance and update of the website.

     10.5.2.  Franchisor may (but is not required to) include at the website an interior page containing information about the Inn. If Franchisor includes such information on the website, Franchisor may require Franchisee to prepare all or a portion of the page, at Franchisee's expense, using a template that Franchisor provides. All such information will be subject to Franchisor's approval before posting.

     10.5.3.  Although not required to do so, Franchisor also may develop or identify an electronic network (an "Intranet") through which Franchisor and its franchisees can communicate by e-mail or similar electronic means, Franchisor may post information related to the Red Roof Inn System, and Franchisee may access information related to its operation of the Inn. If Franchisor develops such an Intranet, Franchisee agrees to use the facilities of the Intranet in strict compliance with the Standards (including, without limitation, protocols and restrictions relating to the encryption of Confidential Information and prohibitions against the transmission of libelous, derogatory or defamatory statements).

     10.5.4.  In the event Franchisee elects to create a website for the Inn, such website must meet the Standards, including, but not limited to, any guidelines for domain names and the look and content of the website, as indicated in the Internet Style Guidelines or as otherwise designated in writing by Franchisor from time to time. If Franchisee elects to create a website for the Inn pursuant to this Section 10.5.4, Franchisee will be responsible for all costs and expenses associated with the creation, development and maintenance of such website.

11.    <u>INSURANCE</u>

    11.1.  Insurance:  Before the commencement of any activities under this Franchise Agreement, Franchisee shall procure, and shall maintain in full force and effect at all times during the term of this Franchise Agreement, at Franchisee's sole expense, an insurance policy or policies of the types, in the coverage amounts, and with the terms specified in this Section 11, as follows:

11.1.1. Commercial Property Insurance with coverage on an all risk basis, insuring the Inn, fixtures, equipment and improvements and the betterments for an amount not less than 90% of the replacement cost thereof, as well as full coverage for twelve (12) months of business interruption and an endorsement covering its legal liability for loss or theft of data. In the event of damage or destruction to the Inn, unless mortgagee requires otherwise, the proceeds of any such insurance shall be used to repair or restore the Inn in accordance with renovation or construction plans and specifications prepared by Franchisee and approved in writing by Franchisor. Franchisor, its Affiliates and successors, and their respective past and present officers, directors, partners, agents, and employees shall be endorsed as an additional insured under the policy. Such insurance will contain a waiver of subrogation in favor of Franchisor, its Affiliates and successors and their respective past and present officers, directors, partners, agents, and employees.

11.1.2. Commercial General and Commercial Umbrella Liability Insurance with independent contractor's coverage and coverage for liability assumed under contract, for libel, slander, defamation, false arrest, detention, or imprisonment, malicious prosecution, wrongful entry, invasion of privacy and for any claim for loss of property of Franchisor or any guest caused by a dishonest or fraudulent act by an employee of Franchisee, with a minimum combined single coverage limit of $5,000,000 each occurrence. In addition, if alcoholic beverages are sold at the Inn, Dram Shop/Liquor Liability Insurance shall also be provided with limits of not less than $5,000,000 per occurrence. The policy shall be written on the then-current ISO occurrence form (or a substitute form providing equivalent coverage) and shall also provide Broad Form Blanket contractual liability coverage with minimum coverage limits of $5,000,000 each occurrence. Franchisor, its Affiliates and successors, and their respective past and present officers, directors, partners, agents, employees shall be endorsed as an additional insured under the policy, such evidence shall be by an Additional Insured Endorsement – Grantor of Franchise, ISO Form CG 2029 or its equivalent, Additional Insured wording on a Certificate of Insurance is not acceptable. If any coverage required by this paragraph is not included in the then-current ISO occurrence form, it can be provided by separate policy. The coverage in this paragraph (ii) shall in every instance be primary and without right to contribution from any coverage maintained by Franchisor or its Affiliates. Franchisee shall provide notice to Franchisor of any claim or suit arising out of or in connection with its operation of the Inn within three (3) days of its receipt thereof.

11.1.3. Automobile Liability Insurance (and if necessary, Umbrella Liability Insurance) for all owned, non-owned and hired vehicles, covering bodily injury, death and property damage with a minimum combined single coverage limit of $5,000,000. Franchisor, its Affiliates and successors, and their respective past and present officers, directors, partners, agents, employees shall be endorsed as an additional insured under the policy. The coverage in this paragraph (iii) shall in every instance be primary and without right to contribution from any coverage maintained by Franchisor or any Affiliate.

11.1.4. Statutory Workers' Compensation Insurance with employers liability and/or commercial umbrella insurance limits not less than $500,000 each accident for bodily injury by accident or $500,000 each employee for bodily injury by disease. Franchisee agrees to waive all rights of subrogation against Franchisor and its Affiliates and successors, their respective past and present officers, directors, partners, agents, and employees for recovery of damages.

11.1.5. The insurance coverage described in paragraphs (i) through (iv), above shall be placed with an insurance company or companies having a Bests Key Rating Guide of AVII or better and be satisfactory to Franchisor. Any and all deductibles and/or self-insured retentions are the sole responsibility of Franchisee. No such required policy may have a deductible that exceeds $25,000, which such deductible shall be the responsibility of Franchisee.

11.2. Additional Insured: Franchisee agrees to direct its insurance company to furnish to Franchisor at least ten

19

(10) days before the commencement of construction or renovation of the Inn, and again at least ten (10) days before the anticipated Opening Date, current certificates of insurance indicating: (a) the name and address of the Inn; (b) that with regard to the coverage in Sections 11.1.1, 11.1.2 and 11.1.3 above, Franchisor, its Affiliates and successors, and their respective past and present officers, directors, partners, agents and employees are additional insureds; (c) that, with regard to the coverage in Section 11.1.4 above, the insurer has waived subrogation; and (d) evidence showing that the premiums thereof have been paid. Additionally, evidence of renewal shall be furnished to Franchisor before the expiration date of such insurance. Such policy or policies shall stipulate that Franchisor shall receive a thirty (30) days written notice of cancellation or reduction in coverage or other alteration of the policy or policies. All certificates of insurance shall be addressed to:

> Red Roof Franchising, LLC
> c/o Lockton Companies.
> 5 Centerpointe Drive, Suite 400
> Lake Oswego, OR 97035

With a copy to:    Franchise Legal Department
> Red Roof Franchising, LLC
> 7810 Walton Parkway
> New Albany, OH 43054
> Facsimile Number (614) 225-5290

The Certificate Holder and additional insured should be listed on the certificate of insurance and the Additional Insured endorsement as follows:

> Red Roof Franchising, LLC and Red Roof Inns, Inc.

11.3. **Change of Required Coverage:** Franchisor may from time to time during the term of this Franchise Agreement, at its sole option, require that the minimum limits and types of insurance coverage described Section 11.1 be reasonably increased or changed in any manner (including, without limitation, amounts and types of coverage) as determined solely by Franchisor. Franchisee shall comply with such requirements, at Franchisee's sole cost and expense, and shall deliver evidence of such compliance to Franchisor within thirty (30) days of its receipt of written demand by or on behalf of Franchisor for any such increase or change in said insurance.

11.4. **Other:**

11.4.1.    Franchisee's obligation to obtain and maintain the policy or policies described in this Section 11, in the amounts specified in this Section 11 or in the Manuals, shall not be limited in any way by reason of any insurance which may be maintained by Franchisor or Franchisor's approved or designated suppliers, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions in Section 15 of this Franchise Agreement. Nothing contained herein shall be deemed to be a representation by Franchisor that the required insurance coverages will insure Franchisee in part or in whole against any or all insurable risk arising from or in connection with the establishment or operation of the Inn.

11.4.2.    Upon the execution of this Franchise Agreement, on each policy renewal date thereafter, and each time a change is made in any insurance or insurance carrier, Franchisee shall submit evidence of satisfactory insurance, as specified in this Section 11.

11.4.3.    Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Franchise Agreement, as such requirements may be revised from time to time by Franchisor in the Manuals or otherwise in writing, Franchisor shall have the right and authority (but not the obligation)

20

to procure such insurance and to charge the cost of such policy thereof to Franchisee, which charge, plus a reasonable fee for Franchisor's efforts in so acting (not to exceed $2,500), shall be payable by Franchisee immediately upon notice. The foregoing remedies shall be in addition to any other remedies Franchisor or its Affiliates may have.

11.4.4.    Notwithstanding anything to the contrary stated herein, Franchisor shall under no circumstances be liable for any premiums or costs of insurance and/or indemnification or defense incurred by Franchisee to fulfill any of the insurance requirements stated herein.

## 12.    TRANSFER OF INTEREST

12.1.    Transfer by Franchisor: Franchisor may transfer or assign this Franchise Agreement or any part of its rights or obligations under this Franchise Agreement to any person or legal entity, provided that the transferee is an entity to which Franchisor transfers all or substantially all of the franchise agreements for Red Roof Inns and the transferee or assignee accepts the transfer or assignment. Franchisee agrees that Franchisor shall have no liability after the effective date of such transfer or assignment for the performance of any obligations under this Franchise Agreement.

12.2.    Transfer by Franchisee:

12.2.1.    Franchisee understands and acknowledges that the rights and duties set forth in this Franchise Agreement are personal to Franchisee, and that Franchisor has granted this Red Roof Inn franchise in reliance on Franchisee's business skills, financial capacity and character of Franchisee and its owners and on the Guarantee, Indemnification and Acknowledgement Agreement attached to this Franchise Agreement as Exhibit C. Accordingly, except as permitted in this Section 12, neither Franchisee nor any of its owners shall sell, assign, transfer, convey, exchange, gift, lease, sublease, pledge, mortgage or otherwise encumber, whether for consideration or otherwise, any direct or indirect ownership interest in Franchisee, this Franchise Agreement, the Inn, or substantially all of the assets of the Inn, whether by merger or otherwise and whether or not such event constitutes a transfer or assignment under applicable law (each event, a "Transfer").

12.2.2.    Notwithstanding anything in this Section 12, the Franchisee shall at all times during the term of this Franchise Agreement own or control the real property and all improvements thereon at the Approved Location. Any change of ownership or control of the real property and improvements thereon at Approved Location is subject to Franchisor's prior written consent.

12.3.    Franchisor's Consent to Transfer: For Franchisor to consider granting consent for a proposed Transfer, which consent may be withheld based on any reasonable grounds, Franchisee or the transferring owner shall provide Franchisor at least sixty (60) days prior written notice of any proposed Transfer, in such form as Franchisor may require, together with: (i) all information which Franchisor believes would be appropriate for consideration by Franchisor in connection with Franchisor's review of the proposed transfer and (ii) a non-refundable transfer application fee in the amount of Two Thousand Five Hundred Dollars ($2,500) (the "Transfer Application Fee"). This Transfer Application Fee, which is in addition to the Transfer Fee, if applicable, required by Section 12.3.4, and shall not obligate Franchisor to approve the proposed Transfer. Upon Franchisor's request, Franchisee shall provide such additional information and documentation relating to the proposed Transfer as Franchisor may reasonably require. Franchisor may, in its sole discretion, require any or all of the following as conditions of its approval of a proposed Transfer:

12.3.1.    Franchisee's compliance with all terms of this Franchise Agreement and any other agreement between Franchisee and Franchisor, including, but not limited to, curing any and all existing

defaults or events that would become defaults with the giving of notice and the passage of time, including the payment in full of all unpaid obligations owed to Franchisor, its Affiliates or approved or designated suppliers:

> 1.3.2.   Franchisee agrees to remain liable for all of its obligations to Franchisor which arose before the effective date of the Transfer and executes any and all instruments reasonably requested by Franchisor to evidence such liability.

12.3.3.   Franchisee and its owners execute a general release, in a form satisfactory to Franchisor, that waives, releases and discharges all claims that Franchisee, its owners, their Affiliates and the respective officers, directors, employees and agents of each of them have, have had or may ever have, against Franchisor, its Affiliates and their respective officers, directors, shareholders, employees or agents, past or present, in their corporate or individual capacities arising or accruing up to the date of Transfer.

12.3.4.   Franchisee pays to Franchisor a transfer fee of Fifteen Thousand Dollars ($15,000) upon closing of the Transfer (the "Transfer Fee"); provided, however, that if Franchisee does not timely submit information and other items described in this Section, or if Franchisee's proposed Transfer requires Franchisor to engage outside parties to evaluate the proposed Transfer, then, in addition to the Transfer Fee, Franchisor may require Franchisee to reimburse Franchisor for its reasonable out-of-pocket costs and expenses associated with the Transfer, including, without limitation, legal and accounting fees.

12.3.5.   The transferee meets Franchisor's then-current qualifications for new franchisees, including, but not limited to, the ability to demonstrate to Franchisor's satisfaction that the transferee and, if applicable, its owners possess good moral character, business reputation and credit rating and adequate financial resources and capital to operate the Inn.

12.3.6.   The transferee and the transferee's manager(s), at transferee's expense, complete any training programs then in effect for new franchisees to the satisfaction of Franchisor.

12.3.7.   The transferee agrees, at the transferee's expense, to upgrade the Inn to conform to the then-current Standards and specifications for Inns operating under the System (and execute a form created by us to evidence such obligation), and to complete such upgrading within a reasonable time specified by Franchisor.

12.3.8.   The transferee shall execute the following: the then-current form of transfer agreement and consent, and the then-current form of Red Roof Inn franchise agreement. Transferee shall also execute any other ancillary agreements as Franchisor may require. Notwithstanding the terms of any new franchise agreement, the transferee shall not be required to pay the initial franchise fee.

12.3.9.   The transferee and its owners, if applicable, execute Franchisor's then-current form of guarantee of the transferee's performance of its obligations under the assumed or new franchise agreement.

12.3.10.  If applicable, Franchisee and the transferee execute Franchisor's then-current transfer agreement covering termination of this Franchise Agreement.

12.4.   Transfer to Related Entity of Franchisee or Other Business Entity:  Notwithstanding the terms of Section 12.3, Franchisee shall have the following Transfer rights:

12.4.1.   From the Effective Date to the date which is six (6) months from the Opening Date (the "Transfer of Convenience Period") Franchisee or all the owners of Franchisee shall be permitted to make one Transfer to a transferee entity owned by the owners in the same proportions as set forth in this Franchise

Agreement, without payment of a Transfer Application Fee or a Transfer Fee. Franchisor's consent may, in its sole discretion, be conditioned on the following requirements:

12.4.1.1. Evidence of the transferee entity's governing documents, which shall provide that its activities are confined exclusively to operate the Red Roof Inn franchise and activities related thereto;

12.4.1.2. The transferee entity, and its owners shall enter into an agreement, in a form satisfactory to Franchisor, unconditionally guaranteeing the full payment and performance of the transferee entity's obligations to Franchisor; and

12.4.1.3. Franchisee shall assign the Franchise Agreement in a form acceptable to Franchisor.

12.4.2. After expiration of the Transfer of Convenience Period, Franchisee, or the owners of Franchisee collectively, shall have the right to transfer up to a total of twenty percent (20%) of ownership in Franchisee (in the aggregate for the entire term considering all Transfers collectively, whether effected in one or a series of transactions), without payment of a Transfer Application Fee or Transfer Fee. Franchisor's consent may, in its sole discretion, be conditioned on the following requirements:

12.4.2.1 Franchisee provides prior written notice to Franchisor;

12.4.2.2 All new owners execute a guarantee in a form acceptable to Franchisor;

12.4.2.3 Revision of the ownership Schedule attached as Exhibit B to this Franchise Agreement.

12.4.2.4 All new owners meet Franchisor's then-current qualifications for new franchisees.

12.4.2.5 Such a transfer will not relieve a prior owner of its obligations under this Franchise Agreement prior to the Transfer. For such obligations accruing after the Transfer, the prior owner shall continue to be obligated unless the new owner accepts responsibility for those obligations.

12.4.3. At any time during the initial term of this Franchise Agreement, an owner that owns a majority interest in Franchisee may acquire the interest of one or more minority owners upon the conditions:

12.4.3.1 Franchisee submits notice of such Transfer to Franchisor;

12.4.3.2 Franchisee pays the Transfer Fee, and

12.4.3.3 Franchisee obtains the execution of such guarantees or assumptions of liability as Franchisor may require.

Transfers under this Section 12.4.3 shall not require execution of a new Franchise Agreement.

12.5. Right of Franchisee's Heirs Upon Death or Disability of Franchisee: In the event of the death or medically certified incapacity of an individual Franchisee who is a sole proprietor or any owner of a Franchisee that is a corporation or other legal entity (a "Death or Incapacity"), an executor, administrator, trustee or personal representative shall give Franchisor written notice of such Death or Incapacity within thirty (30) days thereof.

23

Upon a Death or Incapacity, the Franchise Agreement may transfer to an executor, administrator, trustee or personal representative of Franchisee (a "Franchisee by Death or Incapacity") in accordance with such person's will, the intestacy laws of the state or otherwise by operation of law, provided that: (i) within one (1) year of such Death or Incapacity, the Franchisee by Death or Incapacity meets all of Franchisor's then-current qualifications for a new franchisee. A Transfer under this Section shall not be subject to a Transfer Application Fee or a Transfer Fee, but shall be subject to the conditions of Section 12.3 and its subparts.

12.6. Franchisor's Right of First Refusal:

12.6.1. If Franchisee or its owners shall at any time decide to sell, transfer or assign any right or interest under this Franchise Agreement, or any ownership interest in Franchisee if Franchisee is a corporation, partnership or other entity, Franchisee or its owners shall first obtain a bona fide, executed, written offer from a responsible and fully disclosed purchaser and shall submit to Franchisor an exact copy of such offer, along with all items required in Section 12.3 and its subparts and any other additional information and documentation relating to the offer as Franchisor may require (the offer and all related documents and fees, the "Offer"). Franchisor shall have the right and option for a period of thirty (30) days after its receipt of delivery of the Offer, exercisable upon written notice to Franchisee or its owners, to purchase such rights or interests for the price and on the terms and conditions contained in the Offer, provided that Franchisor may substitute equivalent cash for any form of payment proposed in the Offer. If Franchisor elects to accept the Offer, the Transfer Application Fee will be refunded and closing on such purchase must occur within the later of (i) ninety (90) days from the delivery of Franchisor's delivery of written notice of intent to purchase; or (ii) ninety (90) days after the date Franchisor receives and obtains all necessary permits and approvals, or such other date as the parties may agree upon in writing.

12.6.2. If Franchisor does not exercise its right of first refusal, Franchisee or its owners may complete the sale of such interest to the bona fide purchaser pursuant to the requirements of this Section 12 and provided that if the sale to such purchaser is not completed in a manner substantially similar to the original terms of the Offer or if the sale to such bona fide purchaser is not completed within one (1) year after delivery of the Offer to Franchisor, Franchisor shall again have the right of first refusal provided herein.

12.6.3. Franchisor's failure to execute its right of first refusal under this Section shall not constitute a waiver of its subsequent rights of first refusal or any other provision of this Franchise Agreement.

12.6.4. Upon a request for a Transfer pursuant to this Section 12.6, including its subparts, Franchisor may assign its purchase rights under this Section 12.6 to a third party of the Franchisor's choosing.

12.6.5. In the event an offer from a third party provides for payment of consideration other than cash or involves certain intangible benefits, Franchisor may elect to purchase transferor's interest for the reasonable cash equivalent. If the parties cannot agree within a reasonable time on the reasonable cash equivalent of the non-cash portion of the offer, then such amount shall be determined by two (2) appraisers, with each party selecting one (1) appraiser, and the average of their determinations shall be the exercise price. After determination of the exercise price by the appraisers, Franchisor may elect to exercise its right of first refusal at that price or not. In the event of an appraisal, each party shall bear its own legal and other costs and shall bear the appraisal fees equally. If Franchisor exercises its right of first refusal, it shall have the right to set off against any payment due to Franchisee (i) all fees for any independent appraiser due from the Franchisee, and (ii) all amounts due Franchisor, its Affiliates and its approved or designated suppliers from Franchisee, Franchisee's owners, and any of Franchisee's Affiliates.

12.7. Public Sale by Franchisee: In addition to the other requirements of this Section 12, securities in Franchisee may be offered to the public only in compliance with this Section 12.7. All materials required by federal or state law to be filed in connection with the offer or sale of any interest in Franchisee shall be submitted to Franchisor for review before filing with any governmental agency and any materials to be used in any offering of interests exempt from filing shall be submitted to Franchisor for review before their use. Franchisor's review of any offering materials shall be limited solely to the subject of the relationship between Franchisee and Franchisor. No Franchisee offering shall imply, by use of the Proprietary Marks or otherwise, that Franchisor is participating as an underwriter, issuer or offer or of Franchisee's or Franchisor's securities. Franchisee and other participants in the offering must fully indemnify Franchisor in connection with the offering. For each proposed offering, Franchisee shall pay to Franchisor a non-refundable offering fee of Ten Thousand Dollars ($10,000) or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering, including, without limitation, legal and accounting fees.

12.8. Other Transfer Provisions:

12.8.1.     At Franchisor's request, Franchisee shall obtain covenants similar in substance to those in this Section 12, in a form specified by Franchisor, from any of its owners agreeing not to engage in a Transfer except in accordance with the terms and conditions of this Franchise Agreement; provided, that this provision shall not apply to owners that are required to comply with the reporting requirements under Section 13 or Section 15 of the Securities Exchange Act of 1934.

12.8.2.     Without limiting any of the provisions of this Section 12, throughout the term of this Franchise Agreement, Franchisee's governing documents shall provide that no transfer of any interest in Franchisee may be made except in accordance with this Section 12, and any certificate issued by Franchisee evidencing such interests shall bear a conspicuous printed legend to that effect. Upon Franchisor's request, Franchisee shall furnish to Franchisor copies of its governing documents and any other documents Franchisor may reasonably request. No change affecting the power to direct and control the affairs of Franchisee shall be made in Franchisee's governing documents, nor shall Franchisee or the owners enter into any shareholders' agreement, management agreement, voting trust or other arrangement affecting the power to direct and control the affairs of Franchisee, without Franchisor's prior written consent.

12.8.3. Franchisee shall not enter into any third party management agreement, or other similar arrangement for the operation of the Inn without Franchisor's approval.

## 13.     DEFAULT AND TERMINATION

13.1     Early Termination: If this Franchise Agreement terminates prior to the Expiration Date, such termination will result in damages payable to Franchisor, including lost future revenue and profits to Franchisor, harm to the goodwill associated with the System and the Proprietary Marks, and increased costs to Franchisor to redevelop or re-franchise the market in which the Inn is located. Franchisor and Franchisee agree that such damages may be difficult to quantify or estimate. Therefore, if the Franchise Agreement is terminated due to Franchisee's failure to open the Inn, as specified in the Renovation Addendum, Construction Addendum or otherwise, Franchisee agrees to pay Franchisor liquidated damages as set forth in the Renovation Addendum or Construction Addendum, as applicable. If the Franchise Agreement is terminated after the Opening Date, Franchisee agrees to pay to Franchisor, as a result of such termination, and in addition to any other monies owed hereunder, liquidated damages (for early termination and not as a penalty) equal to the greater of (a) $100,000 or (b) the average of the monthly Royalty Fee, Marketing and Reservations Fee and Preferred Members Program Fee required by the Franchise Agreement for the thirty-six (36) months preceding Franchisee's termination (or if Franchisee has been operating the Inn as a Red Roof Inn for less than thirty-six (36) months, the average of the months Franchisee operated the Inn as a Red Roof Inn before termination), multiplied by the lesser of (i) thirty-

six (36), or (ii) the number of months remaining in the term of this Franchise Agreement. Franchisee shall pay Franchisor the payment specified in this Section no later than five (5) days following: the termination of this Franchise Agreement or Franchisor's written request thereof. In addition to Franchisor's right to the payment of liquidated damages as provided in this Section, Franchisor shall not otherwise be limited in its ability to recover other monies due under the Franchise Agreement and to otherwise seek damages or equitable relief for the harm caused by the conduct which gave rise to the termination, as well as for any other defaults of Franchisee under the Franchise Agreement and to obtain such other relief in law or equity as provided for in this Franchise Agreement; provided, that Franchisor shall not be entitled to recover damages for lost future revenue or profits, loss of good will, or cost of redeveloping or refranchising the market in which the Inn is located, in excess of the liquidated damages specified in this Section.

13.2. Events of Default: The occurrence of any of the following events shall constitute a default under this Franchise Agreement:

13.2.1. Franchisee becomes insolvent or makes a general assignment for the benefit of creditors; a petition in bankruptcy is filed by Franchisee or such a petition is filed against, and consented to by, Franchisee; Franchisee is adjudicated as bankrupt; if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; if proceedings for a composition with creditors under any state or federal law is instituted by or against Franchisee; Franchisee is dissolved; execution is levied against the Inn or any part or asset of the Inn, or suit to foreclose any lien or mortgage against the Inn or any part or asset of the Inn is instituted against Franchisee and not dismissed within ninety (90) days; or if the Inn or any part or asset of the Inn is sold after levy;

13.2.2. The failure of an executor, administrator, trustee or personal representative of a deceased Franchisee to comply with the provisions of Section 12.5;

13.2.3. Franchisee ceases to do business at the Approved Location, or ceases to operate the Inn under the Proprietary Marks and System, or loses the right to possession of the Inn, or otherwise forfeits the right to operate the Inn at the Approved Location; provided, that if the cessation of business or loss of possession results from a fire or other casualty, then the provisions of Section 5.19 of this Franchise Agreement shall apply;

13.2.4. The construction, renovation, maintenance or operation of the Inn, in the sole opinion of Franchisor, presents a threat or danger to public health or safety and an immediate shutdown of the Inn is either required by competent authority or reasonably determined by Franchisor to be essential to avoid substantial liability or loss of goodwill;

13.2.5. Franchisee, any owner or any entity controlled by any owner is convicted of a felony or any other crime or offense, or if Franchisee, any owner or any entity controlled by any owner acts, or operates the Inn or any other business, in any manner that is reasonably likely, in the sole opinion of Franchisor, to adversely affect the System, the Proprietary Marks, the goodwill associated therewith or Franchisor's or its Affiliate's interests therein;

13.2.6. Any Transfer or attempted Transfer in violation of Section 12 of this Franchise Agreement;

13.2.7. Franchisee or any owner fails to comply with the covenants in Sections 7 and 8, Franchisee fails to exercise reasonable care to prevent disclosure of Franchisor's Confidential Information, or Franchisee uses the RediStay™ software outside the scope of the Software Agreement or otherwise breaches the Software Agreement;

13.2.8. Franchisee or any owner makes any material false statements or omissions, negligently or otherwise, in connection with Franchisee's Application for the franchise, the execution of this Franchise Agreement, or in connection with any information submitted to Franchisor;

13.2.9. Franchisee or any owner misuses or participates in any unauthorized use of the Proprietary Marks or otherwise adversely impacts the goodwill associated therewith or Franchisor's or its Affiliate's rights therein, including, without limitation, any use of the Proprietary Marks before receiving written authorization to open the Inn as a Red Roof Inn, except as otherwise expressly permitted under the Renovation Addendum or Construction Addendum, as applicable;

13.2.10. Franchisee commits a default of any terms of the Franchise Agreement more than three times in any consecutive twelve (12) month period, whether the same or different defaults, and whether or not such defaults are cured after notice;

13.2.11. Franchisee fails to strictly comply with the terms of the Renovation Addendum on or before the dates set forth therein, including, without limitation, if Franchisee opens the Inn before receiving Franchisor's written approval to do so pursuant to the Renovation Addendum or Construction Addendum, as applicable;

13.2.12. If Franchisee fails, refuses or neglects to pay any monies owing to Franchisor or its approved or designated suppliers when due, or to submit the financial information or other Reports required by Franchisor under this Franchise Agreement;

13.2.13. If, in connection with the establishment or operation of the Inn, Franchisee, by act or omission, allows a continuing violation of any law, ordinance, rule or regulation of a governmental agency, in the absence of a good faith dispute over its application or legality and without having promptly resorted to an appropriate administrative or judicial forum for relief therefrom;

13.2.14. If Franchisee fails to comply with the requirements concerning the upgrading of the Inn set forth in Section 5.1 hereof;

13.2.15. If Franchisee lists the Inn on an internet site or in other electronic media in violation of Sections 10.2 or 10.5 of this Franchise Agreement;

13.2.16. If Franchisee fails any quality measurement of the Inn, or otherwise fails to maintain Franchisor's Standards or comply with Franchisor's procedures as set forth in the Manuals or otherwise in writing; or

13.2.17. If after receipt of written demand from Franchisor, Franchisee fails to timely comply with its obligations in violation of Section 15.2 of this Franchise Agreement.

13.3. Termination: Upon the occurrence of any of the events set forth in Section 13.2, Franchisor may, without prejudice to any other rights or remedies contained in this Franchise Agreement or provided by law or equity, terminate this Agreement. Such termination shall be effective immediately without notice upon the occurrence of the events set forth in paragraph 13.2.1. Such termination shall be effective immediately upon written notice upon the occurrence of the events set forth in paragraphs 13.2.2 through 13.2.11. Such termination shall be effective thirty (30) days (five (5) days for monetary defaults) after written notice upon the occurrence of the events set forth in paragraphs 13.2.12 through 13.2.17 if such defaults are not cured within such period. If the Franchisee cures such default and requests reinstatement to the System and Franchisor agrees to do so, Franchisor may, at its discretion, charge Franchisee the then-current Reinstatement Fee, which is currently Five Thousand

Dollars ($5,000.00).

13.4. Franchisor's Additional Remedies: In the event Franchisee commits any default of this Franchise Agreement, and if Franchisee fails to cure any such default which may be cured as permitted hereunder, Franchisor may, in its sole discretion, in lieu of, or as a preliminary action before, terminating this Franchise Agreement as provided in Sections 13.2 or 13.3, cease accepting reservations from guests for lodging at Franchisee's Inn through the Reservation System (provided, that Franchisor shall preserve, and Franchisee shall honor, all reservations received before the date reservations cease to be accepted), and/or refuse to provide any operational or procurement support, and/or refuse to list the Inn in the Directory, until the default is cured. During any period in which some or all of the services listed above are suspended, Franchisee shall nevertheless comply with all of its obligations under this Franchise Agreement, including the obligation to pay all fees. If the Franchisee cures such default and requests reinstatement to the Reservation System and Franchisor agrees to do so, Franchisor may, at its discretion, charge Franchisee the then-current Reinstatement Fee, which is currently Five Thousand Dollars ($5,000.00).

14.    OBLIGATIONS UPON TERMINATION

14.1    Obligations of Franchisee: Upon termination or expiration of this Franchise Agreement, Franchisee shall, at its expense:

14.1.1. Immediately cease to operate the Inn under the System and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former Red Roof Inn franchisee.

14.1.2. Immediately and permanently cease to use, by advertising or in any other manner whatsoever, the name "Red Roof Inn," any other Proprietary Marks or identifying characteristics of the System, and any and all Confidential Information, methods, procedures and techniques associated with the System including, but not limited to, the Computer System. Franchisee shall remove and discontinue using for any purpose, any and all signs, fixtures, furniture, furnishings, equipment, software, advertising, materials, stationery, supplies, forms or other articles, which display the Proprietary Marks. Nothing herein contained shall allow Franchisee to sell or Transfer any of the foregoing without obliterating any Proprietary Marks or distinctive features of the System, unless transferred to Franchisor, its designee, or another franchised Red Roof Inn. Any signs bearing the Proprietary Marks which Franchisee is unable to remove within one (1) day following expiration or termination of this Franchise Agreement shall be completely covered by Franchisee until the time of their removal, which shall be within ten (10) days following the expiration or termination of this Franchise Agreement. Franchisee agrees that all signs that are not timely removed pursuant to this Section may be removed by Franchisor, and all legal and other costs related to such removal shall be borne by Franchisee.

14.1.3. Immediately make such modifications or alterations as may be necessary to distinguish the Inn so clearly from its former appearance and from other Red Roof Inns as to prevent any possibility of confusion therewith by the public, including, without limitation, removing of all distinctive physical and structural features identifying Red Roof Inns or the System, removing of all distinctive signs and emblems, and removing or altering of any design or decor features that Franchisor, in its sole discretion, determines to be indicative of a Red Roof Inn, including, without limitation, the removal of the Red Roof Inn hoods and the exterior and interior color schemes. Franchisee shall, at Franchisee's expense, make such specific additional changes as Franchisor may reasonably request for purposes of de-identifying the Inn. Franchisee shall do all things necessary to prevent the operation of any business at the Approved Location (by Franchisee or others) in violation of this Section 14.1.

14.1.3.1. Without limiting the foregoing, (a) the following distinctive features or devices

associated with the System shall be painted colors other than the then-current colors used by Red Roof Inns: Sign Cans for all signs, Sign Poles for all signs, Doors, and Railings; and (b) the following distinctive features or devices associated with the System shall be completely removed from the Approved Location: Logo Sign Faces, Non-Logo Signs in Red Roof Inn colors and font, Red Roof Inn Posters, Red Roof Inn Drapes, Red Roof Inn Bedspreads and top sheets, and Red Roof Inn-designated coffee machine and presentation, Phone Face Plates, Signage on the back of guest doors, Pool Signage and Red Roof Inn Theft Disclaimer Signage.

14.1.3.2. Until all modifications and alterations required by this Section 14.1 are completed, Franchisee shall (i) maintain a conspicuous sign at the registration desk in a form specified by Franchisor stating that the Inn is no longer associated with the System, and (ii) advise all guests or prospective guests who telephone the Inn that it is no longer associated with the System.

14.1.3.3. If Franchisee fails to initiate immediately and timely complete the alterations described herein Franchisee acknowledges and agrees that Franchisor or its designated agents may enter the premises of the Inn and adjacent areas at any time and make such alterations, at Franchisee's sole risk and expense, without responsibility for any actual or consequential damages to the property of Franchisee or others, and without liability for trespass or other tort or criminal act. Franchisee expressly acknowledges that its failure to make such alterations timely and completely will cause irreparable injury to Franchisor.

14.1.4. Take such action as may be necessary to cancel any trade, fictitious or assumed name or equivalent registration which contains the mark "Red Roof Inn" or any other Proprietary Marks, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within five (5) days after termination or expiration of this Franchise Agreement.

14.1.5. Refrain from using any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, in connection with the operation of any other business or the promotion thereof. Franchisee further agrees not to utilize any design or decor features, designation of origin, description or representation (including, but not limited to, reference to Franchisor, the System, or the Proprietary Marks) which, in Franchisor's sole discretion, suggests or represents a present or former association or connection with Franchisor, the System, or the Proprietary Marks.

14.1.6. Timely pay all sums owing to Franchisor, its Affiliates and its approved or designated suppliers, including all amounts required under Section 14.1.7 below. Franchisor shall have the right, within sixty (60) days following the termination or expiration of this Franchise Agreement, to inspect the Inn premises and offices, and conduct a review and/or an audit of Franchisee's books and records for the purpose, among other things, of assuring Franchisee's compliance with the provisions of this Section 14. Such books and records shall be made available to Franchisor at the Approved Location upon five (5) days written notice to Franchisee.

14.1.7. Pay upon demand to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor in connection with Franchisee's default and/or the early termination or expiration of this Franchise Agreement including, without limitation, a fee of Two Thousand Five Hundred Dollars ($2,500.00) per day for Franchisee's failure to comply with the obligations set forth in this Section ("De-Identification Fee"), and those incurred to enforce and/ or obtain injunctive or other relief in connection with this Section 14.

14.1.8. Immediately return to Franchisor all Manuals and other Confidential Information, and all other records, files, instructions, correspondence and other materials provided by Franchisor related to the operation of the Inn, and all copies thereof (all of which are acknowledged to be Franchisor's property), and shall retain no copy or record of any of the foregoing, with the exception of Franchisee's copy of this

Franchise Agreement, any correspondence between the parties, and any other documents which Franchisee reasonably needs for compliance with any provision of law.

14.2. Franchisor's Fixture Purchase Option Upon Expiration or Termination: Franchisor shall have the option, (which may be assigned by Franchisor to any person, including its Affiliates) to be exercised within thirty (30) days after the termination or expiration of this Franchise Agreement, to purchase from Franchisee any or all of the furnishings, signs, fixtures, supplies or inventory of Franchisee bearing the Proprietary Marks at their then-current fair market value. If the parties are unable to agree on fair market value within ten (10) days after the termination or expiration of this Franchise Agreement, then such amount shall be determined by two (2) licensed appraisers, with each party selecting one (1) appraiser, and the average of their determinations shall be the appraised value. The two (2) appraisers shall determine fair market value within ten (10) days after their appointment. If the amount determined by the appraisers is not acceptable to Franchisor, then Franchisor shall have the option to withdraw its offer. Each party shall bear its own legal and other costs and shall bear the appraisal costs equally. If Franchisor elects to exercise any option herein provided, it shall have the right to set off all amounts due from Franchisee, if any, against any payment due hereunder to Franchisor, its Affiliates and its approved or designated suppliers.

## 15. INDEPENDENT CONTRACTOR AND INDEMNIFICATION

15.1. Independent Contractor: The parties hereto understand and agree that, in connection with its performance under this Franchise Agreement, Franchisee, its agents, employees and successors, shall act as independent contractors, and nothing herein shall at any time be construed to create the relationship of employer and employee, partnership, principal and agent, or joint venture between Franchisor (or its Affiliates) and Franchisee. In addition, Franchisee shall have no right or authority to enter into any contract, commitment, or agreement, or to speak on behalf of, or incur any debt or obligation in the name or on behalf of, Franchisor or its Affiliates unless expressly authorized to do so in writing by Franchisor. Franchisee shall exercise full and complete control over, and have full responsibility for, its contracts, daily operations, labor relations, employment practices and policies, including but not limited to recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of its employees. During the term of this Franchise Agreement, Franchisee shall at all times hold itself out to the public as an independent contractor who independently owns and operates the Inn pursuant to a franchise agreement from Franchisor.

15.2. Indemnification and Release:

15.2.1 Franchisee assumes full responsibility and liability for its construction, renovation, establishment or operation of the Inn and Franchisee's performance under this Franchise Agreement. Franchisor and its Affiliates shall in no event be liable by reason of any act or omission of Franchisee in its construction, renovation, establishment or operation of the Inn or its performance under this Franchise Agreement or for any claim or judgment arising therefrom against Franchisee or Franchisor or its Affiliates.

15.2.2. Franchisee shall indemnify, protect, defend release and hold harmless Franchisor, its Affiliates and predecessors, their respective successors and assigns, and the officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them, past or present (the "Indemnitees"), from and against any and all payments of money (including, without limitation, all liabilities, losses, damages, claims, suits, demands, fines, settlement amounts, costs, expenses, attorneys' fees, investigative fees and court costs) for injury to property or persons including death (and in addition including, without limitation, the injury or death of any of Franchisee's employees or agents or damage to any of their property) which may arise out of or in connection with any act or omission, whether actual or alleged, negligent or otherwise, of Franchisee, its employees or agents, in connection with Franchisee's ownership, construction, renovation, establishment or operation of the Inn, the performance of Franchisee, its employees or agents, under this Franchise Agreement (including, but not

limited to, fraudulent or dishonest acts of Franchisee or its employees or agents, personal injury, slander, libel, defamation, false arrest, detention or imprisonment, malicious prosecution, wrongful entry or eviction, invasion of privacy, or disclosure of any customers personally identifiable or credit card information), or the default by Franchisee or its owners of any representation, warranty, or obligation under this Franchise Agreement. Franchisee's obligations under this Section 15.2.2 shall also extend to circumstances in which the damages to property or persons including death (and in addition including, without limitation, the injury or death of any of Franchisee's employees or agents or damage to any of their property) arise in whole or in part as a result of the negligent acts or omissions of the Indemnitees, but shall not apply to the extent they are caused by the intentional or willful misconduct of such Indemnitee. The obligations of Franchisee under Section 15.2.2 shall survive the termination or expiration of this Franchise Agreement. Franchisee shall comply with its obligations hereunder within ten (10) business days of its receipt of Franchisor's written demand for indemnification.

15.2.3. Franchisor shall have the right, through counsel of its own choosing and at Franchisee's sole cost and expense, to direct, manage and control its defense of any matter to the extent that it could directly or indirectly affect Franchisor or its Affiliates. In addition to the foregoing, Franchisee also will reimburse Franchisor or its Affiliates for all expenses reasonably incurred by Franchisor or its Affiliates to protect themselves from, or to remedy, defaults by Franchisee under this Franchise Agreement.

15.2.4. Franchisee agrees that all of the obligations of Franchisor under this Franchise Agreement are to Franchisee, and no other party is entitled to rely on, enforce or obtain relief for default of, such obligations, directly or indirectly, by subrogation or otherwise. Franchisee agrees and understands that Franchisor and its Affiliates shall not, nor shall they have the obligation to, indemnify or hold Franchisee harmless from and against any action or claim by any third party based upon Franchisor's or its Affiliates' exercise of any of its rights in accordance with the terms of this Franchise Agreement.

16. ACKNOWLEDGMENTS AND REPRESENTATIONS

16.1 Acknowledgments by Franchisee: Franchisee acknowledges that:

16.1.1. It has independently investigated the business franchised hereunder, including current and potential market conditions, competitive factors and risks, and recognizes that the business venture contemplated by this Franchise Agreement involves business risks and that its success will be largely dependent upon the ability of Franchisee as an independent business owner.

16.1.2. It has not received from Franchisor or its representatives, or relied on, any representation, warranty or guaranty, express or implied, whatsoever, including, but not limited to, the potential volume, profits or success of the business venture contemplated by this Franchise Agreement, or that otherwise contradicts the information in Franchisor's Franchise Disclosure Document.

16.1.3. It has received a completed copy of this Franchise Agreement, the exhibits and addenda hereto, and the agreements relating thereto, if any, at least seven (7) calendar days before the date on which this Franchise Agreement was executed, or such longer period as required by the law of the state in which the Inn is located. Franchisee further acknowledges that Franchisee has received the Franchise Disclosure Document required by the Federal Trade Commission and, if applicable, the state in which the Inn is located, at the earlier of (i) at least fourteen (14) calendar days before the date on which this Franchise Agreement was executed; or (ii), if required by state law, at the "first personal" meeting with Franchisor's representatives, or such longer period as required by the law of the state in which the Inn is located.

16.1.4. It has read and understood this Franchise Agreement, the Attachments, Exhibits,

Schedules and Addenda hereto, and the agreements relating thereto, if any, and that Franchisor has accorded Franchisee ample time and opportunity to consult with advisors of Franchisee's own choosing about the potential benefits and risks of entering into this Franchise Agreement.

16.1.5. Franchisee acknowledges that the System may be supplemented, improved and otherwise modified from time to time by, and in the sole discretion of, Franchisor, and Franchisee agrees to comply with all reasonable requirements of Franchisor in that regard.

16.2    Representations by Franchisee:  Franchisee represents and warrants to Franchisor that:

16.2.1. Franchisee represents that the owners named in Exhibit B to this Franchise Agreement have the legal and/or beneficial interests set forth in the ownership Schedule contained in Exhibit B to this Franchise Agreement. Franchisor shall have the right to approve any additional owners, and to require that each additional owner personally guarantee the Franchise Agreement. Upon Franchisor's request, Franchisee shall from time to time furnish Franchisor with a current list of all owners and their mailing addresses.

16.2.2. In recognition of the valuable specialized training and Confidential Information received by them pursuant to this Franchise Agreement, Franchisee and its owners covenant that during the term of this Franchise Agreement, except as otherwise approved in writing by Franchisor, Franchisee and its owners shall not, directly or indirectly, for itself or themselves, or through, on behalf of, or in conjunction with any other person or legal entity, divert or attempt to divert any present or prospective business or customer of any inn operating under the System to any competitor (other than an inn owned or franchised by Franchisor or an Affiliate of Franchisor),  by direct or indirect inducement or otherwise.

17.    MISCELLANEOUS

17.1.    Notices:  All notices pursuant to this Franchise Agreement shall be in writing and shall be personally delivered; sent by facsimile (if confirmed by regular mail within three (3) days); mailed by registered or certified mail, return receipt requested; or dispatched by overnight delivery to the respective parties at the following addresses, unless and until a different address has been designated by written notice to the other party:

Notices to Franchisor:    Chief Development Officer
Red Roof Franchising, LLC
7815 Walton Parkway
New Albany, OH 43054
Facsimile Number (614) 225-5328

With copy to:    General Counsel
Red Roof Franchising, LLC
785 Walton Parkway
New Albany, OH 43054
Facsimile Number (614) 225-5380

Notices to Franchisee:   JPR Hospitality Inc.
Attn: Janantik N. Pandya
1000 John R Road, Ste. 214
Troy, MI 48083
Facsimile Number n/a

Notice shall be deemed to have been received as follows: by personal delivery – at the time of delivery; by facsimile (if confirmed by regular mail as set forth above) - at time of faxing; by overnight delivery service - on the next business day following the date on which the notice was given to the overnight delivery service; and by registered or certified mail, return receipt requested - three (3) days after the date of mailing.

17.2.  Nature of Agreement:  This Franchise Agreement together with the Schedules, Exhibits and Addenda attached hereto are intended by Franchisor and Franchisee to be the final and binding expression of their agreement, to contain all of the material terms agreed to, be a complete and exclusive statement of the terms thereof and supersede all prior oral or written agreements, negotiations and representations.  No representations, understandings or agreements, oral or written, have been made or relied upon in the making of this Franchise Agreement other than as specifically set forth herein. Unless otherwise provided in this Franchise Agreement, this Franchise Agreement and the Exhibits and Addenda attached hereto may only be amended, modified, or supplemented by a writing signed by authorized representatives of both Franchisor and Franchisee. Oral modification of this Franchise Agreement is not permitted, and Franchisee hereby waives any right to claim an oral modification of this Franchise Agreement. Nothing in this Franchise Agreement is intended to disclaim the representations made by Franchisor in the franchise disclosure document furnished to Franchisee.

17.3.  Severability:  In the event any provision of this Franchise Agreement, in whole or in part (or the application of any provision to a specific situation), is held to be invalid or unenforceable by the final judgment of a court of competent jurisdiction after appeal or the time for appeal has expired, such invalidity shall be limited to such specific provision or portion thereof (or to such situation), and this Agreement shall be construed and applied in such manner as to minimize such unenforceability.  This Franchise Agreement shall otherwise remain in full force and effect.

17.4.  Headings:  The headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of any provision of this Franchise Agreement.

17.5.   Construction of Agreement and Applicable Law:

17.5.1.  This Franchise Agreement and any claims arising under it or in relation to it or to the relationships between the parties shall be governed, construed, interpreted and enforced by and under the laws of the State of Ohio, without regard to, and without giving effect to, the application of Ohio conflict-of-law rules; except that if Ohio law would invalidate or make unenforceable any provision of this Franchise Agreement, then that provision will be governed by the law of any relevant state whose law would uphold or enforce the provision.

17.5.2.  All Schedules, Exhibits, and Addenda to this Franchise Agreement are incorporated herein by reference as if fully set forth herein.

17.6.  Dispute Resolution:  Franchisor has established a policy for Franchisee to air and resolve grievances, issues and disputes internally.  If the parties are unable to resolve such disputes through this policy, the parties agree to submit any claim, controversy or dispute arising out of or relating to this Franchise Agreement (including the Attachments, Exhibits, Schedules and Addenda hereto) or the relationship created by this Franchise Agreement (with the exception of those disputes concerning failure to commence or complete construction or renovation, failure to commence operations, insurance, insurance requirements, monetary obligations,

indemnification, quality inspection ratings, the Inn has ceased operations, unauthorized use of trademarks, failure to de-identify) to non-binding mediation before bringing such claim, controversy or dispute in a court or before any other tribunal. The parties shall select a mediator within thirty (30) days of request of mediation by either party. The mediation shall be conducted through either an individual mediator or a mediator appointed by a mediation services organization or body approved by Franchisor and experienced in the mediation of lodging service business disputes or franchise disputes, and shall be conducted at a location selected by Franchisor that is reasonably proximate to the Inn. The costs and expenses of any such mediation, including compensation and expenses of the mediator (and except for the attorneys' fees incurred by either party), shall be borne by both parties equally. If the parties are unable to resolve the claim, controversy or dispute within ninety (90) days after either party requests mediation, then either party may bring a legal proceeding under Section 17.8 below to resolve such claim, controversy or dispute unless such time period is extended by written agreement of the parties. Notwithstanding the foregoing, Franchisor may bring an action for injunctive or other extraordinary relief (including, without limitation, specific performance), or involving the possession or disposition of, or other relief relating to, real property in a court having jurisdiction and in accordance with Section 17.7 below, without first submitting such action to mediation.

17.7. Jurisdiction and Venue: With respect to any claims, controversies or disputes which are not finally resolved through mediation or as otherwise provided above, Franchisor, Franchisee, and owners hereby irrevocably submit themselves to the jurisdiction of the state and federal courts located in Columbus, Ohio having subject matter jurisdiction of the claim, and hereby waive all objections to personal jurisdiction for the purpose of carrying out this provision. Franchisee and owners hereby agree that service of process may be made upon any of them in any proceeding relating to or arising out of this Franchise Agreement or the relationship created by this Franchise Agreement by any means allowed by the laws and applicable rules of procedure of the United States, the State of Ohio, the state of residence of the Franchisee or owner, or the state in which the Inn is located.

17.8. Litigation:

17.8.1. No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Franchise Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy provided herein or permitted by law or equity, but each shall be cumulative of every other right or remedy.

17.8.2. To the extent permitted by law, Franchisor and Franchisee and its owners irrevocably waive trial by jury in any action, proceeding or counterclaim, whether at law or in equity, brought by either of them against the other. Any and all claims and actions arising out of or relating to this Franchise Agreement, the relationship of Franchisee and Franchisor, or Franchisee's operation of the Inn, brought by either party hereto against the other, whether in mediation or a legal action, shall be commenced within three (3) years from the occurrence of the facts giving rise to such claim or action, notwithstanding any applicable statute of limitations, or such claim or action shall be barred.

17.8.3. Except for any indemnification obligations in Section 17, Franchisor and Franchisee and its owners hereby waive to the fullest extent permitted by law any right to or claim of any punitive or exemplary damages against the other, provided, that this provision shall not serve as a waiver of rights to damages set forth in Section 13.

17.8.4. In connection with any suit or proceeding, brought by Franchisor or Franchisee to enforce any of their respective rights under this Franchise Agreement, the prevailing party in such suit or proceeding shall be entitled to recover its reasonable attorney's fees and expenses of litigation and its court costs incurred therein.

17.9. Consent and Waiver:

17.9.1 Whenever this Franchise Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request therefor to Franchisor, and such approval or consent shall not be valid unless given in writing and signed by an authorized officer of Franchisor. Franchisor may, in its sole discretion, withhold its approval or consent to any such request unless otherwise provided for herein.

17.9.2. Except for the obligations of Franchisor specifically set forth in this Franchise Agreement, Franchisor makes no warranties or guaranties upon which Franchisee may rely. Franchisor assumes no liability or obligation to Franchisee by providing any waiver, approval, consent or suggestion to Franchisee in connection with this Franchise Agreement, or by reason of any delay or denial of any request therefore.

17.9.3. Franchisor will not be deemed to waive or impair any right, power or option this Franchise Agreement reserves (including, without limitation, Franchisor's right to demand exact compliance with every term, condition and covenant of this Agreement) because of any custom or practice at variance with this Franchise Agreement's terms; Franchisor's waiver of or failure to exercise any right, power or option, whether of the same, similar or different nature, with other Red Roof Inn franchisees; or the existence of franchise agreements for other Red Roof Inn locations which contain provisions different from those contained in this Franchise Agreement. Franchisor's waiver of any particular default of Franchisee shall not affect or impair Franchisor's rights with respect to any subsequent default of the same, similar or different nature; nor shall any delay, forbearance or omission of Franchisor to exercise any power or right arising out of any breach or default by Franchisee affect or impair Franchisor's rights with respect to such default, or Franchisor's right to declare any subsequent breach or default and to terminate this Franchise Agreement before the expiration of its term. Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding default by Franchisee of any terms, covenants or conditions of this Franchise Agreement.

17.9.4. In the event that either party hereto shall be delayed, hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection or natural disaster (all referred to herein as "Force Majeure"), then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. Force Majeure shall not include Franchisee's lack of adequate financing. Notwithstanding the foregoing, in no event shall the time periods established for commencement or completion of construction or renovation be excused, and/or extended in the aggregate for longer than (one) 1 year due to one or more events of Force Majeure.

remainder of page intentionally left blank

IN WITNESS WHEREOF, each of the parties hereto has caused this Franchise Agreement to be executed by its duly authorized representative as of the date first above written.

**FRANCHISOR**

RED ROOF FRANCHISING, LLC
a Delaware limited liability company

By: _____
            Authorized Officer

**FRANCHISEE**

JPR HOSPITALITY INC.

By: _____
            (Vice) President

2018 Franchise Agreement

**EXHIBIT A TO**
**RED ROOF INN FRANCHISE AGREEMENT**

<u>**SUPPLEMENTAL TERMS**</u>

1.  Expiration Date:
    This Franchise Agreement shall expire twenty (20) years after the Opening (Effective Date for transfers) Date.

2.  Approved Location:
    The Approved Location for the Inn is **1214 Corporate Drive, Holland, OH 43528**

3.  To be operated as:
    - ☒ Red Roof Inn
    - ☐ Red Roof Inn & Suites (See Addendum)
    - ☐ Red Roof PLUS+ (See Addendum)
    - ☐ Red Roof PLUS+ & Suites (See Addendum)

4.  Exclusive Territory:
    The Exclusive Territory is **all the area within a circle created by a three (3.0) mile radius whose center point is the front door of the Approved Location.**

5.  The following Red Roof Inn locations are in existence within the Exclusive Territory on the date hereof:
    **NONE**

6.  Guest Rooms:
    The Inn shall have **106** guest rooms.

**FRANCHISOR**

RED ROOF FRANCHISING, LLC
a Delaware limited liability company

By: _____
Authorized Officer

**FRANCHISEE**

JPR HOSPITALITY INC.

By: _____
(Vice) President

**EXHIBIT B TO**
**RED ROOF INN FRANCHISE AGREEMENT**

<u>OWNERSHIP SCHEDULE</u>

The following list identifies the owners of Franchisee:

| <u>Name</u> | Type of <u>Interest</u> | Percentage Interest <u>in Franchisee</u> |
|---|---|---|
| **Janantik N. Pandya** | **Common Stock** | **50%** |
| **Ritesh M. Vaidya** | **Common Stock** | **50%** |

Initial: _J.P._
Franchisee

Initial: _R.V_
Franchisor GBL

**EXHIBIT C TO**
**RED ROOF INN FRANCHISE AGREEMENT**

<u>**GUARANTEE, INDEMNIFICATION AND ACKNOWLEDGMENT**</u>

As an inducement to and as additional consideration for Franchisor to enter into the Franchise Agreement, with Franchisee, the undersigned Guarantors, jointly and severally, hereby unconditionally agree to guarantee to Franchisor, its Affiliates, and their respective successors and assigns the due, complete and punctual performance and observance of all of Franchisee's financial obligations under the Franchise Agreement including, without limitation, the due and timely performance of all payment obligations (the "Guarantee"). Additionally, each Guarantor shall submit to Franchisor, upon written request from time to time, a copy of its current financial statement.

Upon demand by Franchisor, the undersigned will immediately make each payment required of Franchisee under the Franchise Agreement, including damages, costs and expenses owed by Franchisee, payments due under any indemnification claim for reimbursement and all other duties and obligations that are susceptible to being satisfied by payment. This Guarantee is a guarantee of payment, and not of collection. This Guarantee is a primary obligation of the undersigned and is an unconditional, absolute, irrevocable present and continuing obligation and guarantee of performance and is not subject to any defense other than that of full prior performance. The undersigned hereby waive any right to require Franchisor, its Affiliates, successors and assigns to: (a) proceed against Franchisee for any payment required under the Franchise Agreement; (b) proceed against or exhaust any security from Franchisee; or (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee or any other person. Without affecting the obligations of the undersigned under this Guarantee, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Franchise Agreement and notice of demand for payment by Franchisee, and agree to be bound by any and all such amendments and changes to the Franchise Agreement.

The undersigned hereby agree to defend, protect, indemnify and hold Franchisor, its Affiliates, their respective successors and assigns, and the officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees, past or present, of each of them (the "Indemnitees"), harmless from and against any and all losses, damages, liabilities, costs and expenses (including, but not limited to, reasonable attorneys' fees, reasonable costs of investigation and court costs) resulting from, consisting of, or arising out of, or in connection with, any act or omission of, or any failure by Franchisee to perform any obligation of Franchisee under the Franchise Agreement, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

The undersigned hereby acknowledge and agree to be individually bound by all of the terms of the Franchise Agreement, including, in particular, those contained in Sections 7, 8, 12, 14, 15, 16 and 17 of the Franchise Agreement. These sections contain a number of provisions that may affect the legal rights of the undersigned, including a waiver of jury trial, waiver of punitive or exemplary damages and limitations on when claims may be raised.

This Guarantee shall terminate upon the termination or expiration of the Franchise Agreement, except with respect to any and all obligations and liabilities which arose or accrued under the Franchise Agreement on or before the effective date of such termination, in which case this Guarantee shall remain in full force and effect with respect to such obligations or liabilities until such obligations or liabilities have been fully satisfied or discharged by the undersigned. In addition, all covenants which by their terms continue in force after the expiration or termination of the Franchise Agreement shall remain in force

according to their terms. Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

The undersigned shall pay Franchisor and any Indemnitees for all costs and expenses (including, but not limited to, reasonable attorneys' fees and court costs) they incur in connection with any action they bring to enforce this Guarantee or any other action related to or arising out of this Guarantee in which the Franchisor or such Indemnitee is deemed to be the prevailing party.

Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Franchise Agreement.

This Guarantee and any claims arising under it shall be governed, construed, interpreted and enforced by under the laws of the State of Ohio. In the event of any conflict of law, the laws of Ohio shall prevail, without regard to, and without giving effect to, the application of the State of Ohio conflict-of-law rules; except that if Ohio law would invalidate or make unenforceable any provision of this Franchise Agreement, then that provision will be governed by the law of any relevant state whose law would uphold or enforce the provision. With respect to any claims, controversies or disputes which arise under this Guarantee or the Franchise Agreement, the undersigned hereby irrevocably submit themselves to the jurisdiction of the state and federal courts located in Columbus, Ohio having subject matter jurisdiction of the claim, and hereby waive all objections to personal jurisdiction for the purpose of carrying out this provision. The undersigned hereby agree that service of process may be made upon any of them in any proceeding relating to or arising out of this Guarantee, or the Franchise Agreement or the relationship created by the Franchise Agreement by any means allowed by the laws and applicable rules of procedure of the United States, the State of Ohio, the state of residence of the Guarantor, or the state in which the Inn is located.

All notices pursuant to this Guarantee or the Franchise Agreement shall be in writing and shall be personally delivered; sent by facsimile (if confirmed by regular mail within three (3) days); mailed by registered or certified mail, return receipt requested; or dispatched by overnight delivery to the respective parties at the following addresses, unless and until a different address has been designated by written notice to the other party:

Notices to Franchisor:  Chief Development Officer
       Red Roof Franchising, LLC
       7815 Walton Parkway
       New Albany, OH 43054
       Facsimile Number (614) 225-5328

With copy to:     General Counsel
       Red Roof Franchising, LLC
       7815 Walton Parkway
       New Albany, OH 43054
       Facsimile Number (614) 225-5380

Notices to Guarantors:     **JPR Hospitality Inc.**
**Attn: Janantik N. Pandya**
**1000 John R Rd., Ste. 214**
**Troy, MI 48083**
**Facsimile Number n/a**

Notice shall be deemed to have been received as follows: by personal delivery – at the time of delivery; by facsimile (if confirmed by regular mail as set forth above); - at time of faxing; by overnight delivery service - on the next business day following the date on which the notice was given to the overnight delivery service; and by registered or certified mail, return receipt requested - three (3) days after the date of mailing.

The undersigned acknowledge that they received a completed copy of the Franchise Agreement, including the Attachments, Exhibits, Schedules and Addenda thereto, including this Guarantee, and any other agreements relating to the Franchise Agreement, at least seven (7) calendar days before the date on which this Guarantee was executed, or such longer period as required by the law of the state in which the Inn is located. The undersigned further acknowledge that Franchisee has received the Franchise Disclosure Document required by the Federal Trade Commission and, if applicable, the state in which the Inn is located, at the earlier of (i) at least fourteen (14) calendar days before the date on which this Franchise Agreement was executed; or (ii), if required by state law, at the "first personal" meeting with Franchisor's representatives, or such longer period as required by the law of the state in which the Inn is located.

The undersigned acknowledge that they have read and understood the Franchise Agreement, including the Attachments, Exhibits, Schedules and Addenda thereto, including this Guarantee, and any other agreements relating to the Franchise Agreement, and that Franchisor has accorded the undersigned ample time and opportunity to consult with advisors of their own choosing about the potential benefits and risks of entering into this Guarantee.

IN WITNESS WHEREOF, each of the undersigned has signed this Guarantee as of the date of the Franchise Agreement.

**GUARANTORS**

_____
JANANTIK N. PANDYA

_____
RITESH M. VAIDYA

## RENOVATION ADDENDUM
## TO RED ROOF INN FRANCHISE AGREEMENT

This Renovation Addendum ("Renovation Addendum") is made and entered into by and between Franchisor and Franchisee with respect to the Franchise Agreement between the parties of even date herewith. The Renovation Addendum is incorporated into the Franchise Agreement as if its terms and conditions were fully set forth therein. It amends and supplements the Franchise Agreement. Initially capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Franchise Agreement.

### RECITALS:

Franchisor and Franchisee wish to enter into this Renovation Addendum to provide for the terms and conditions upon which the Inn shall be converted to a Red Roof Inn at the Approved Location.

Now, therefore, in consideration of the mutual promises and covenants set forth herein and in the Franchise Agreement, the parties agree as follows:

1.      Site Control. If not previously provided, within 90 days after the execution of this Renovation Addendum or before the Opening Date, whichever is earlier, Franchisee shall deliver to Franchisor satisfactory evidence, in the form of a warranty deed or long term lease, that it has secured ownership or the right to possession of the Approved Location.

2.      Renovation Schedule. Franchisee shall comply with: all development and construction obligations set forth in this Renovation Addendum, the renovation schedule in Schedule A attached hereto and incorporated by reference and the property improvement plan in Schedule B attached hereto and incorporated by reference.

3.      Renovation Plans and Specifications. Franchisee shall renovate and equip the Inn in strict accordance with Franchisor's Standards and specifications and approved Renovation Plans. The "Renovation Plans" shall include, without limitation, architectural, mechanical, electrical, structural, civil engineering, and landscaping drawings, in such detail and containing such information (such as door locking systems and other safety features) as Franchisor may request.

3.1.      Franchisee shall submit to Franchisor proposed renderings and Renovation Plans. on or before the date specified in Schedule A to this Renovation Addendum. Franchisee acknowledges and agrees that all Renovation Plans must be submitted to and approved by Franchisor.

3.2.      The Renovation Plans shall be prepared by a qualified architect, design firm, engineer and/or contractor (individually and collectively, a "Qualified Preparer"). Franchisee shall be required to submit to Franchisor such information concerning a Qualified Preparer's qualifications as Franchisor may request. Franchisee acknowledges and agrees that Franchisor is not, and shall not be, liable for the performance of any Qualified Preparer retained by Franchisee.

3.3.      Upon submission of the Renovation Plans to Franchisor, Franchisor shall approve or deny such Renovation Plans in its sole discretion. Renovation of the Inn shall not commence until the Renovation Plans have been approved by Franchisor.

1

3.4.    Franchisee acknowledges that Franchisor's approval of the Renovation Plans is not, and should not be considered as, any assurance or guarantee that the Renovation Plans will satisfy federal, state and/or local construction and/or zoning requirements, including, without limitation, compliance with the Americans with Disabilities Act. Franchisee shall be solely responsible for compliance with all federal, state and local laws. Franchisor shall not be responsible for architecture or engineering, code, zoning, or other requirements or laws, ordinances, or regulations of any state, local or federal governmental body, or for any errors, omissions, or discrepancies of any nature in any drawings or specifications used for renovation of the Inn. Franchisee's architect or contractor must certify to Franchisor that the Renovation Plans satisfy all federal, state and local laws. Franchisee shall not reproduce, use or permit the use of any of the design concepts, drawings, or specifications of a Red Roof Inn without Franchisor's prior written approval.

4.    <u>Renovation</u>.    Franchisee shall commence renovation of the Inn on or before the date specified in Schedule A ("<u>Commencement of Renovation</u>") and shall give Franchisor written notice of the actual commencement date within five (5) days thereafter. After Commencement of Renovation, Franchisee shall continue to renovate the Inn (except for delays which may be caused by the occurrence of events constituting "Force Majeure") until renovation is completed in strict accordance with the approved Renovation Plans, which may not be changed or modified after Franchisor's approval without Franchisor's prior written consent.

4.1. Franchisee shall notify Franchisor in writing of any event of Force Majeure upon its occurrence. In the event Franchisee requests, in writing, an extension of any of the deadlines contained herein and Franchisor approves such request, Franchisor may condition any extension upon compliance with then-current System Standards.

4.2.    During renovation, Franchisee shall, and shall cause its architect, engineer, contractors and subcontractors to, cooperate fully with Franchisor for the purpose of permitting Franchisor or approved or designated suppliers to inspect the Approved Location and the progress of the renovation to determine whether the work is proceeding in strict accordance with the Renovation Plans and the Standards and specifications contained in the Manuals. Franchisee acknowledges and agrees that inspections by Franchisor or its approved or designated suppliers shall be for the purpose of assuring Franchisee's compliance with the Standards required by Franchisor, and shall not be, nor be construed as, assurances or approvals that the renovation is in compliance with any federal, state or local law, or regulation, or zoning or building requirements.

4.3.    Franchisee shall provide progress reports to Franchisor, in the form and manner, and at such times, that Franchisor may reasonably request.

5.    <u>Furniture, Fixtures and Supplies</u>. Franchisee shall bear the entire cost of renovating and furnishing the Inn. Franchisee shall order, purchase and/or lease and install all fixtures, equipment, furnishings, furniture, signs, supplies and other items necessary to complete and open the Inn as specified in the Renovation Plans and the Manuals.

6.    <u>Opening</u>.    Franchisee shall not open for business at the Approved Location as a Red Roof Inn ("<u>Opening</u>") without written authorization of Franchisor to open. Franchisor shall have no obligation to approve Opening until all of the conditions of this Section 6 are satisfied:

2018 Franchise Agreement
Red Roof Renovation Addendum

6.1.    Renovation that is required to be completed prior to Opening has, in Franchisor's sole judgment, been completed in strict accordance with the approved Renovation Plans;

6.2.    Franchisee has obtained a Certificate of Occupancy and has submitted to Franchisor a contractor's certification that the renovation of the Inn has been completed in strict accordance with the approved Renovation Plans and all required laws;

6.3.    Franchisee has installed at the Inn all furnishings, furniture, equipment, signs, supplies and other items that are required to be installed prior to Opening and such items are in strict conformity with (in Franchisor's sole judgment): the Renovation Plans, the Manuals, the Franchise Agreement and this Renovation Addendum;

6.4.    Franchisee has paid all amounts due Franchisor, its Affiliates and its approved or designated suppliers;

6.5.    Franchisee has given Franchisor written notice that all terms and conditions of the Franchise Agreement and this Renovation Addendum have been satisfied and the Inn is ready to open for business as a Red Roof Inn;

6.6.    Franchisor has granted written approval to open and operate the Inn as a Red Roof Inn.

6.6.1    Franchisor shall use its best efforts to inspect the Inn within fourteen (14) days after receiving the notice specified in Section 6.5 and to conduct any such other investigations that Franchisor deems necessary to determine whether Franchisee has satisfied all requirements for opening the Inn as a Red Roof Inn. Franchisor shall not be liable for delays or loss occasioned by the inability of Franchisor to complete its investigation and to make such determination for reasons beyond Franchisor's control.

6.6.2    If Franchisee notifies Franchisor that the Inn is ready for Opening and upon inspection Franchisor determines, in its sole discretion, that Franchisee has not satisfied all requirements for Opening, Franchisor may re-visit the property to confirm readiness before opening and charge Franchisee a re-visit fee. Such fee is currently $2,500 but is subject to change by Franchisor.

7.    Conditional Opening/Limited License to Advertise.

7.1    Franchisor may, in its sole discretion, conditionally authorize Franchisee to open and operate the Inn as a Red Roof Inn prior to completing the requirements set out in Section 6, above, if in the sole judgment of Franchisor, Franchisee is making satisfactory progress toward completion of the Renovation Plan, the items remaining are minor, and Franchisee agrees to complete all remaining items by a date or dates specified in writing and agreed in writing by Franchisor. If Franchisee fails to comply with all such remaining terms on or before the completion date specified in the written agreement granting the conditional opening, such failure shall be a material breach of the Franchise Agreement, and Franchisor may terminate the Franchise Agreement pursuant to Section 13 thereof.

7.2.    Franchisee shall not advertise or otherwise hold out the Inn as being, or becoming, a Red Roof Inn until Franchisor has approved, in writing, the Opening, or conditional opening, of the Inn as a Red Roof Inn pursuant to this Renovation Addendum.

3

2018 Franchise Agreement
Red Roof Renovation Addendum

8.      Termination.

        8.1.      Franchisee acknowledges that failure to meet the deadlines set forth in this Renovation Addendum or Schedules A or B attached hereto shall constitute an event of default under the Franchise Agreement. Upon the occurrence of such default, Franchisor may terminate the Franchise Agreement, as provided therein, without prejudice to any other rights or remedies contained in the Franchise Agreement or provided by law or equity.

        8.2.      Upon any termination of the Franchise Agreement as a result of Franchisee's failure to comply with the terms of this Renovation Addendum, Franchisee shall comply with all post-termination obligations under Section 14 of the Franchise Agreement.

        Except as otherwise expressly set forth herein, all terms and conditions of the Franchise Agreement shall fully apply to this Renovation Addendum as if set forth herein.

remainder of page intentionally left blank

N WITNESS WHEREOF, the parties hereto have executed and delivered this Renovation Addendum effective as of the date of the Franchise Agreement.

FRANCHISOR

RED ROOF FRANCHISING, LLC
a Delaware limited liability company

By: _____
       Authorized Officer

FRANCHISEE

JPR HOSPITALITY INC.

By: _____
       (Vice) President

## FOR TRANSFER LOCATIONS

This Addendum applies if you are the transferee of an existing Red Roof Approved Location.

### 1. TRANSFER AND ASSUMPTION:

This Addendum is for the transfer of an existing Approved Location first granted to Sharad Hospialty Inc. ("Prior Franchisee") in a Franchise Agreement with us dated August 14, 2013 (the "Prior Agreement"). You assume and obligate yourself to perform any and all of the obligations (financials and otherwise) of the Prior Franchisee under the Prior Agreement that is not paid or performed as of the Effective Date, including without limitation, the obligation to pay any unpaid Royalties, Marketing and Reservation Fees, Preferred Members Program Fees or other amounts due us and to correct any uncured defaults other than as expressly superseded by this Agreement. You acknowledge that we may require you or your staff to complete training on the use of the property management or similar computer system for accessing the Reservation System and pay for our retraining fee.

### 2. YOUR IMPROVEMENT OBLIGATION:

**2.1 Improvements.**  We have approved the application you submitted to us and have entered into this Agreement in reliance upon your promise and undertaking to improve, equip and supply the Approved Location in accordance with System Standards. You must provide us with proof that you own or lease the Facility before or within 30 days of the Effective Date. We have performed an inspection of the Approved Location and reviewed our quality assurance records and generated a Property Improvement Plan (the "PIP") of renovations, operational changes, repairs, refurbishments, replacements, and capital improvements to conform the Approved Location to System Standards that is attached to this Agreement. The PIP specifies those renovations and improvements and the specified timeframes for completion. TIME IS OF THE ESSENCE OF THIS AGREEMENT. You will erect a barrier or place signage acceptable to us to exclude Chain guests from accessing any areas under renovation or construction. We may require you to remove, cease display or use, or completely obscure all signage and other items bearing any Proprietary Marks ( the "Marks") until the Location meets System Standards in our discretion. All renovations will comply with System Standards, any approved plans and any PIP attached to this Agreement. We may, in our discretion, require you to place funds in escrow, at your expense, in order to complete all necessary improvements. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the renovations to the Approved Location by the dates specified in this Section or the PIP or (2) you continue to display the Marks and identify the Approved Location as a Red Roof Location if we send you notice that you have failed to complete the renovations by the date specified in the PIP, as provided in this Section. Time is of the essence for the renovations. You must also pay us any travel expenses set forth in Section 5.13 of this Agreement if you fail to complete any renovations by the deadline established in the PIP and our representatives must return to the Approved Location to inspect it.  We may, however, grant you one or more extension of time to complete any phase or item on your PIP in our sole discretion. The grant of an extension to perform your renovations will not waive any other default existing at the time the extension is granted.

**2.2 Improvement Plans.**  You will create plans and specifications for the work described in the PIP (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting renovation of the Approved Location (the "Approved Plans"). We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover

technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors, employees, guests, or others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Approved Location before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. We may offer to provide you or your architect with interior design or other prototypes. If you decline to utilize such prototype(s) in developing the Approved Location, we may charge you a fee for reviewing your custom plans and designs. We may offer other optional architectural and design services for a separate fee. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

2.3 **Opening.**  You may continue to identify and operate the Location under the System while you perform the renovations, if any.

## 3. DEFINITIONS

Effective Date means the date that you first take possession of the Approved Location, even if you sign this Agreement after the date you first take possession of the Approved Location.

Opening Date means the date as of which we authorize you to open the Approved Location for business identified by the Marks and using the System, even if you sign this Agreement after that date. Unless we require that you close the Approved Location to perform any pre-opening Improvement Obligation, the Opening Date is the Effective Date.

remainder of page intentionally left blank

2

IN WITNESS WHERE OF, each of the parties hereto has caused this Franchise Agreement to be executed by its duly authorized representative as of the date first above written.

FRANCHISOR:
RED ROOF FRANCHISING, LLC
A Delaware limited liability company

By: _____
Authorized Officer


FRANCHISEE;

**JPR HOSPITALITY INC.**

By: _____
**(Vice) President**

3

## SCHEDULE D
## ADDENDUM FOR TRANSFER LOCATIONS

**(Property Improvement Plan Attached)**

4

**Property Improvement Plan - Red Roof Inn**
Red Roof Inn, Toledo-Holland OH  Tranfer #058
**10/22/2018**

The owner is responsible for ensuring the property is in compliance with all federal and state ADA regulations at all times.

Franchisee shall perform the following renovations to the Inn in accordance with Red Roof's manuals and standards, including but not limited to the Brand Standards Manual, Design Standard's branding guidelines, signage standards, and paint specifications, all of which may be amended by Red Roof from time to time.

Franchisee shall maintain and operate the Inn in accordance with Red Roof Brand Standards Manual, which may be amended by Red Roof from time to time.

Throughout the duration of the renovation, it is recommended that the franchisee and personnel from Red Roof Inn Design and Construction department work closely together to ensure the renovations are completed timely, efficiently, and to RED ROOF INN standards.

This Property Improvement Plan (PIP) is valid for one hundred and twenty (120) days from the date of inspection reflected herein. If a Franchise Agreement is not executed prior to the expiration of said 120 day time period, the PIP is subject to review and modification by Franchisor.

| Room Count: | 106 |
|---|---|
| Inn Type: | Inn |

**I.  PHASE I – THE FOLLOWING RENOVATIONS MUST BE COMPLETED WITHIN 30 DAYS OF THE EFFECTIVE DATE AS DEFINED IN THE FRANCHISE AGREEMENT IN ACCORDANCE WITH THE RED ROOF INN DESIGN AND FF&E STANDARDS MANUAL AND RED ROOF'S NEXTGEN PAINT SCHEDULE.**

| | | |
|---|---|---|
| EX | Exterior Corridor | Power wash soffits. Repair/replace if necessary. |
| EX | Exterior Corridor | Remove floor covering on walkway/steps and install brand approved flooring product at the direction of RRI Design & Construction. |
| EX | Other | All areas under renovation must be segregated from guests at all times.  Agreed work hours must be strictly adhered to.  All materials, tools and debris to be housed in approved containers on a daily basis. |
| EX | Other | Identify designated area for pet relief. Provide all necessary equipment and supplies for maintaining area and clean up. |
| EX | Other | Replace all damaged and fogged windows. |
| INT | Corridor | Replace any broken or discolored exit signs or emergency lights. |
| INT | Guestrooms | Install irons and ironing boards in Superior King Guestrooms. |
| INT | Guestrooms | Install hairdryer and micro fridge in all Superior King guestrooms. |
| INT | Guestrooms | Install in-room coffee in all Superior King guestrooms. |
| INT | Guestrooms | At least 3 convenience outlets must be located at or above the night stand. |
| INT | Guestrooms | TV Programming must meet RRI Brand Standard, must have a minimum of 24 HD channels and must have a minimum of 2 HBO channels. |
| INT | Guestrooms | Verify all heating and cooling systems are in good working order. |
| INT | Guestrooms | Install drapes properly and replace any broken rods |
| INT | Lobby | You must get prior written approval from Red Roof's Design and Construction Department for lobby layout. |
| INT | Lobby | Install Red Roof Inn standard coffee service. |
| INT | Lobby | Verify phone system auto attendant is within Brand Guidelines. |
| INT | Lobby | Replace all track lighting with current brand specification |
| INT | Other | Verify Wi-Fi is within Brand guidelines. This includes dedicated line with separate static IP Addresses for front desk computers. |
| INT | Other | Comply with all RRI safety & brand collateral standards in guest rooms, baths, lobby and public areas. |
| OTHER | Other | All employees must be in brand standard uniforms and wear approved name tags |

**II. PHASE II – THE FOLLOWING RENOVATIONS MUST BE COMPLETED WITHIN 90 DAYS OF THE EFFECTIVE DATE AS DEFINED IN THE FRANCHISE AGREEMENT, IN ACCORDANCE WITH THE RED ROOF INN NEXT GEN DESIGN AND FF&E STANDARDS MANUAL AND RED ROOF'S NEXTGEN PAINT SCHEDULE.**

| | | |
|---|---|---|
| EX | Other | Clean/repair/replace A/C vent covers. All should be same size, color and style. All vent covers should be evenly installed. |
| EX | Other | Repair or replace all damaged concrete pre-cast |
| EX | Other | Repair or replace dumpster enclosure and paint to current brand standard |
| INT | Bathrooms | Replace the shower curtains. |
| INT | Bathrooms | Install curved shower curtain rods. |
| INT | Bathrooms | Replace the shower head. |
| INT | Guestrooms | Install standard bedding package to include 200 thread count long top sheet, mattress pads, pillow protectors and pillows. |
| INT | Lobby | Replace window treatments. |
| INT | Other | Replace all damaged drywall. Update all textured surfaces to brand uniformity. |
| INT | Vending | Paint walls, ceiling, doors, and trim. |
| INT | Vending | Replace lighting. |
| INT | Vending | Replace flooring. |

**III. PHASE III – THE FOLLOWING RENOVATIONS MUST BE COMPLETED WITHIN 6 MONTHS OF THE EFFECTIVE DATE AS DEFINED IN THE FRANCHISE AGREEMENT, IN ACCORDANCE WITH THE RED ROOF INN NEXT GEN DESIGN AND FF&E STANDARDS MANUAL AND RED ROOF'S NEXTGEN PAINT SCHEDULE.**

| | | |
|---|---|---|
| ex | Exterior Corridor | Replace ceiling lights. |
| EX | Exterior Corridor | Replace wall sconces. |
| EX | Other | Replace all damaged and deteriorated concrete walks, landings and steps. Power wash all and ensure uniformity. |
| EX | Other | Complete exterior building paint including all stucco, doors, siding, railings, and trim. |
| EX | Other | Repair all damaged paved areas throughout the property. |
| EX | Other | Re-stripe and seal coat the parking lot. |
| EX | Other | Install new coach lamps. |
| EX | Other | Update landscaping. |
| EX | Other | Repair or replace all rotted and deteriorated wood trims, railings, facia, gables and soffits |
| EX | Other | Repair or replace all damaged and deteriorated steel |
| EX | Other | Replace all damaged curbs |
| EX | Other | Paint all exposed conduit to match building color |
| INT | Bathrooms | Remove wall covering, apply knock down texture and prime walls. |
| INT | Bathrooms | Paint walls, ceiling, doors and trim. |
| INT | Bathrooms | Install granite vanity tops. |
| INT | Bathrooms | Install under mount sink.(vessel sink for PLUS+ properties) |
| INT | Bathrooms | Install new sink faucet |
| INT | Bathrooms | Replace vanity light |
| INT | Bathrooms | Replace vanity mirror |
| INT | Bathrooms | Install new vinyl plank wood or ceramic tile bath floors and cove base. |
| INT | Bathrooms | Replace towel bars, towel racks and toilet paper holder. |
| INT | Bathrooms | Recaulk tub surrounds and bathtub. |
| INT | Bathrooms | Refinish tubs to like new condition (steel tubs only) or replace with new brand approved units. |
| INT | Guestrooms | Install brand approved bed skirts, white quilted filled blankets, and brand approved coverlets on all beds. |
| INT | Guestrooms | Replace coat rack and hangers. |
| INT | Guestrooms | Install TV sound panel that matches case goods. Mount TV on panel. |
| INT | Guestrooms | Replace all draperies. |
| INT | Guestrooms | Paint walls, ceiling, doors, and trim. |
| INT | Guestrooms | Replace all wall lights, desk lights, and ceiling lights. |
| INT | Guestrooms | Replace all flooring in rooms with vinyl plank wood flooring, carpet tiles, and vinyl cove base. |
| INT | Guestrooms | Replace all desk chairs. |

| INT | Guestrooms | Replace all lounge chairs. |
|-----|------------|----------------------------|
| INT | Guestrooms | Replace artwork. |
| INT | Guestrooms | Replace all case goods. |
| INT | Guestrooms | Replace all guestroom mirrors. |
| INT | Guestrooms | Paint headboard accent wall. |
| INT | Guestrooms | Replace all Mattress and Box Springs |
| INT | Guestrooms | Paint all wall heater panels or replace with new |
| INT | Guestrooms | Replace all guestroom phones with current specification |
| INT | Lobby | Replace lobby furniture. |
| INT | Signs | Replace all interior and/or exterior signage to Red Roof Inn to include door number plaques and directional signs. |
| Other | Guestrooms | All guestrooms furniture, fixtures, equipment and finishes must be consistent and in accordance with current brand standards. Rooms with approved products in place are OK to remain if in like new condition |

Franchisee has reviewed this Property Improvement Plan as it pertains to the Inn and agrees to perform the work as set forth in this document pursuant to the guidelines set forth above and in accordance with the Brand Standards Manual.  **Notwithstanding anything stated herein, Franchisor reserves the right to require Franchisee to make renovations, alterations, repairs, and replacements to the Inn at any time pursuant to the terms of the Franchise Agreement.**

FRANCHISEE:

a(n) _____

By: _____

Name: _JAYANT R  PANDYA_

Title: _President_

FRANCHISOR:

RED ROOF FRANCHISING, LLC

a Delaware limited liability company

By: _____

Name: _____
George B. Limbert

Title: _____
Secretary

## SPECIAL STIPULATIONS ADDENDUM

### INTRO

This Addendum forms part of that certain franchise agreement dated *October 25*, 20*18* (the "Franchise Agreement") by and between RED ROOF FRANCHISING, LLC ("Franchisor"), and **JPR HOSPITALITY INC.** ("Franchisee"), with respect to an inn located at **1214 Corporate Dr., Holland, OH 43528**. Initially capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Franchise Agreement.

**1.    INITIAL FRANCHISE FEE**

You will pay an Initial Fee in the amount of $10,000 which shall be due and payable when you sign this Agreement.

**2.    ROYALTY FEE DISCOUNT**

Notwithstanding anything to the contrary in the Franchise Agreement, including but not limited to Section 4.2, upon written notification to Franchisor that Franchisee has completed the renovations outlined in the Property Improvement Plan (the "PIP") in accordance with the deadlines set forth in the PIP ("Completion Notification"), the Royalty Fee is revised as follows:

a.    For a period of four (4) years commencing upon the Completion Notification ("Discount Period") = three percent (3.0%) of Gross Room Revenues

b.    Commencing on the first day after the end of the Discount Period = four and one-half percent (4.5%) of Gross Room Revenues.

c.    Unless and until you default under the terms of the Franchise Agreement, the modification(s) referred to in this Section will remain in effect. The term "default" shall mean those violations of the Franchise Agreement that are not cured within any applicable cure periods outlined in Sections 13.2 and 13.3 of the Franchise Agreement. The referenced modification(s) are exclusive to you and not transferable to any other party. From and after the date of any such default, the modification(s) set forth in this Section shall be null and void and of no further force and effect, and the original terms set forth in the Franchise Agreement shall thereafter be reinstated.

**3.    MUTUAL TERMINATION WINDOWS**

Notwithstanding anything to the contrary contained in the Franchise Agreement, either party may elect by written notice to the other no sooner than one hundred fifty (150) and not later than sixty (60) days prior to the **fifth, tenth or fifteenth** anniversary from the Effective Date to exercise a right to terminate the Franchise Agreement (each, a "Window"), effective on such anniversary ("Window Termination Date"), without liability to either party because of such termination; provided that such termination shall not relieve either party from any obligation or liability which has accrued prior to the Window Termination Date, including but not limited to Franchisee's obligations to pay all amounts due to Franchisor prior to such Window Termination Date. Such termination shall not affect Franchisee's obligations which are intended to survive any termination or expiration of the Franchise Agreement, including but not limited to Franchisee's obligations under Sections 14 and 15 of the Franchise Agreement. If a notice to elect the Window is not received within the specified notice period, any rights pursuant to this paragraph with respect to that particular Window shall lapse and be

of no further force and effect. Nothing in this paragraph shall otherwise affect the rights of the parties upon termination pursuant to the provisions of the Franchise Agreement. Nothing in this paragraph shall limit the right of Franchisor to terminate the Franchise Agreement for cause pursuant to Section 13 and its subparts, up to the Window Termination Date. Franchisee's election to terminate pursuant to this Section is conditioned upon Franchisee signing Franchisor's then-current form of a mutual termination and release agreement prior to the Window Termination Date. Unless and until you default under the terms of the Franchise Agreement, the modification(s) referred to in this Section will remain in effect. The term "default" shall mean those violations of the Franchise Agreement that are not cured within any applicable cure periods outlined in Sections 13.2 and 13.3 of the Franchise Agreement. The referenced modification(s) are exclusive to you and not transferable to any other party. From and after the date of any such default, the modification(s) set forth in this Section shall be null and void and of no further force and effect, and the original terms set forth in the Franchise Agreement shall thereafter be reinstated.

4.  **EFFECT OF DEFAULT**

Unless and until you default under the terms of the Franchise Agreement, the modification(s) referred to in Section 1 of this Addendum will remain in effect. The term "default" shall mean those violations of the Franchise Agreement that are not cured within any applicable cure periods outlined in Sections 13.2 and 13.3 of the Franchise Agreement. The referenced modification(s) are exclusive to you and not transferable to any other party. From and after the date of any such default, the modification(s) set forth in Sections 2 and 3 shall be null and void and of no further force and effect, and the original terms set forth in the Franchise Agreement shall thereafter be reinstated.

5.  **EFFECT OF TRANSFER**

Unless and until there is a Transfer as defined by the terms of the Franchise Agreement, outlined in Section 12, the modification(s) referenced in Section 1 of this Addendum will remain in effect. The referenced modification(s) are exclusive to you and not transferable to any other party. From and after the date of any such Transfer, the modification(s) set forth in Sections 2 and 3 shall be null and void and of no further force and effect, and the terms set forth in a new Franchise Agreement to be executed by a transferee shall thereafter be effective.

6.  **CONFIDENTIALITY**

You agree to keep the grant of the modification(s) contained in this Addendum in strict confidence and will not disclose them to any persons other than your directors, officers, partners, employees, agents and advisors who have a need to know for the purpose of operating the Inn. Any unauthorized disclosure is default under the Addendum, and we may, at our option, immediately terminate the Franchise Agreement on notice to you or may revoke the modification(s) contained in this Addendum upon any unauthorized disclosure by you. The modification(s) outlined in this Addendum are for the Inn specified in Exhibit A of the Franchise Agreement and do not indicate that any other hotels owned by you or by others will receive similar modification(s).

7.     <u>ORDER OF PRECEDENCE</u>

In the event of an inconsistency or conflict between the terms of this Addendum and the terms of the Franchise Agreement, the terms on this Addendum will supersede and control.

8.     **INTEGRATION**

This Addendum is incorporated into and is a part of the Franchise Agreement.

Except as expressly provided above, nothing in this Addendum shall abrogate, nullify or modify any condition, requirement or provision of this Franchise Agreement.

remainder of page intentionally left blank

IN WITNESS WHEREOF, each of the parties hereto has caused this Addendum to be executed by its duly authorized representative as of the date first above written.

FRANCHISOR

RED ROOF FRANCHISING, LLC
a Delaware limited liability company

By: _____
       Authorized Officer

FRANCHISEE

JPR HOSPITALITY INC.

By: _____
       **(Vice) President**

2018 Franchise Agreement
Special Stipulations Addendum

# EXHIBIT B

# United States Patent Office

984,159
Registered May 14, 1974

## PRINCIPAL REGISTER
### Service Mark

Ser. No. 452,494, filed Mar. 26, 1973



Red Roof Inns, Inc. (Ohio corporation)
536 S. 3rd St.
Columbus, Ohio 43215

For: MOTEL SERVICES, in CLASS 100 (INT. CL. 42).

First use Feb. 20, 1973; in commerce Feb. 20, 1973.

| | |
|---|---|
| Int. Cl.: 42 | |
| Prior U.S. Cl.: 100 | Reg. No. 1,579,616 |
| **United States Patent and Trademark Office** | Registered Jan. 23, 1990 |
| 10 Year Renewal | Renewal Term Begins Jan. 23, 2000 |

## SERVICE MARK
## PRINCIPAL REGISTER

### RED ROOF

RRI FINANCIAL, INC. (NEVADA COR-
PORATION)
2835 SOUTH JONE BLVD
SUITE 2
LAS VEGAS, NV 89102, BY MERGER
WITH; BY MERGER, BY ASSIGN-
MENT, BY ASSIGNMENT, BY AS-
SIGNMENT RED ROOF INNS, INC.
(OHIO CORPORATION) HILLIARD,
OH

OWNER OF U.S. REG. NOS. 948,159
AND 1,022,900.

FOR: MOTEL SERVICES, IN CLASS 42
(U.S. CL. 100).
FIRST USE 8-0-1988; IN COMMERCE
8-0-1988.

SER. NO. 73-810,619, FILED 7-3-1989.

*In testimony whereof I have hereunto set my hand
and caused the seal of The Patent and Trademark
Office to be affixed on Dec. 7, 1999.*

COMMISSIONER OF PATENTS AND TRADEMARKS

Int. Cl.: 42

Prior U.S. Cl.: 100

## United States Patent and Trademark Office

Reg. No. 1,579,616

Registered Jan. 23, 1990

## SERVICE MARK
### PRINCIPAL REGISTER

## RED ROOF

RED ROOF INNS, INC. (OHIO CORPORATION)
4355 DAVIDSON ROAD
HILLIARD, OH 430269699

OWNER OF U.S. REG. NOS. 948,159 AND 1,022,900.

FOR: MOTEL SERVICES, IN CLASS 42 (U.S. CL. 100).
FIRST USE 8-0-1988; IN COMMERCE 8-0-1988.

SER. NO. 73–810,619, FILED 7–3–1989.

JAMES F. VOEGELI, EXAMINING ATTORNEY

Int. Cl.: 42

Prior U.S. Cls.: 100 and 101

**United States Patent and Trademark Office**

Reg. No. 2,224,076

Registered Feb. 16, 1999

## SERVICE MARK
### PRINCIPAL REGISTER

## RED ROOF INNS

RRI FINANCIAL, INC. (NEVADA CORPORA-
TION)
2835 SOUTH JONES BOULEVARD, SUITE 2
LAS VEGAS, NV 89102

FOR: MOTEL SERVICES, IN CLASS 42 (U.S.
CLS. 100 AND 101).
FIRST USE 7–5–1972; IN COMMERCE
7–5–1972.

OWNER OF U.S. REG. NOS. 984,159, 1,580,823
AND OTHERS.
NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "INNS", APART FROM THE
MARK AS SHOWN.

SER. NO. 75–396,879, FILED 11–26–1997.

LORETTA C. BECK, EXAMINING ATTORNEY

# EXHIBIT C

Int. Cl.: 43

Prior U.S. Cls.: 100 and 101

Reg. No. 3,097,408

**United States Patent and Trademark Office**

Registered May 30, 2006

## SERVICE MARK
### PRINCIPAL REGISTER



RRI FINANCIAL, INC. (NEVADA CORPORA-TION)

330 E. WARM SPRINGS ROAD

LAS VEGAS, NV 89119

FOR: HOTELS AND MOTELS, IN CLASS 43 (U.S. CLS. 100 AND 101).

FIRST USE 6-0-2004; IN COMMERCE 6-0-2004.

OWNER OF U.S. REG. NOS. 2,224,076, 2,319,148 AND OTHERS.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "INN", APART FROM THE MARK AS SHOWN.

SER. NO. 78-454,389, FILED 7-21-2004.

CHERYL CLAYTON, EXAMINING ATTORNEY

# EXHIBIT D



March 19, 2021

**_SENT VIA OVERNIGHT DELIVERY AND EMAIL_**

JPR Hospitality Inc.
Attn.: Janantik N. Pandya
1000 John R Road, Suite 214
Troy, MI 48083
Email: drjanantik@gmail.com

     **RE:**    **NOTICE OF DEFAULT RELATING TO RED ROOF INN #058 LOCATED IN TOLEDO – HOLLAND, OH (THE "APPROVED LOCATION")**

Dear Mr. Janantik N. Pandya:

I write on behalf of Red Roof Franchising, LLC ("we,") regarding the Franchise Agreement dated October 23, 2018 between JPR Hospitality Inc. ("you" or "your") and Red Roof Franchising, LLC (the "Agreement"). We write to give you formal notice you are in default under Sections 13.2.12, 13.2.14 and 5 of the Agreement.

You have an outstanding balance due and owing to us in the amount of $22,817.14. Pursuant to Section 13.3, monetary defaults must be paid within 5 days. Please find enclosed a current copy of your Account Status Report for your reference. Your failure to cure this monetary default will result in a suspension of your reservations system.

It has come our attention your Property Improvement Plan ("PIP") is incomplete. To date, 0% of the items listed on your PIP have been completed by you   Please find enclosed the PIP for your reference. You must provide us with notice of purchase for all items to the PIP by March 31, 2021. We further require you to complete all work to the Approved Location according to the PIP by May 31, 2021.

The quality standards for the Approved Location are below brand standards. You must increase your Guest Redi to 80% to be compliant with the brand. This increase must occur on or before May 31, 2021.

Your failure to cure this Notice of Default will result in a suspension of your reservations system. In addition, we are requiring you to take all necessary steps to cure this default. Failure to cure your default will result in the termination of the Agreement.





This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us regarding the Approved Location. We also reserve the right to take any interim steps permitted under the Agreement because of your default.

We encourage you to work with your Franchise Operations Director, Neil Scott, to cure this default

We hope you will take this opportunity to resolve these defaults.

Sincerely,

Michelle Stickel /smw

Michelle Stickel
Director, Legal & Compliance

Enclosure

cc:    Matthew Hostetler, Chief Development Officer
       Fouad Malouf. Senior Vice President Franchise Operations
       Jane Palumbo, Vice President Franchise Operations
       Neil Scott, Franchise Operations Director



# EXHIBIT E



April 9, 2021

### *SENT VIA OVERNIGHT DELIVERY AND EMAIL*

Red Roof Inn Toledo - Holland
Attn.: **Janantik N. Pandya, JPR Hospitality, Inc., /PRIVATE/CONFIDENTIAL**
1214 Corporate Drive
Holland, OH 43258
Email: drjanantik@gmail.com / john@lighthousehg.com

### RE: NOTICE OF DEFAULT RELATING TO RED ROOF INN #058 LOCATED IN TOLEDO – HOLLAND, OH (THE "APPROVED LOCATION")

Dear Mr. Janantik N. Pandya:

This letter was sent via overnight delivery and email to you on March 19, 2021. I write on behalf of Red Roof Franchising, LLC ("we,") regarding the Franchise Agreement dated October 23, 2018 between JPR Hospitality Inc. ("you" or "your") and Red Roof Franchising, LLC (the "Agreement"). We write to give you formal notice you are in default under Sections 13.2.12, 13.2.14 and 5 of the Agreement.

You have an outstanding balance due and owing to us in the amount of $22,817.14. Pursuant to Section 13.3, monetary defaults must be paid within 5 days. Please find enclosed a current copy of your Account Status Report for your reference. Your failure to cure this monetary default will result in a suspension of your reservations system.

It has come our attention your Property Improvement Plan ("PIP") is incomplete. To date, 0% of the items listed on your PIP have been completed by you   Please find enclosed the PIP for your reference. You must provide us with notice of purchase for all items to the PIP by March 31, 2021. We further require you to complete all work to the Approved Location according to the PIP by May 31, 2021.

The quality standards for the Approved Location are below brand standards. You must increase your Guest Redi to 80% to be compliant with the brand. This increase must occur on or before May 31, 2021.

Your failure to cure this Notice of Default will result in a suspension of your reservations system. In addition, we are requiring you to take all necessary steps to cure this default. Failure to cure your default will result in the termination of the Agreement.





This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us regarding the Approved Location. We also reserve the right to take any interim steps permitted under the Agreement because of your default.

We encourage you to work with your Franchise Operations Director, Neil Scott, to cure this default

We hope you will take this opportunity to resolve these defaults.

Sincerely,

Michelle Stickel /sw

Michelle Stickel
Director, Legal & Compliance

Enclosure

cc:     Matthew Hostetler, Chief Development Officer
        Fouad Malouf. Senior Vice President Franchise Operations
        Jane Palumbo, Vice President Franchise Operations
        Neil Scott, Franchise Operations Director



# EXHIBIT F



June 10, 2021

Red Roof Franchising, LLC
Michelle Stickel, Director Compliance and Legal
7815 Walton Parkway
New Albany, OH 43054

**VIA UPS NEXT DAY AIR AND EMAIL**

Red Roof Inn Toledo - Holland
Attn: **Janantik N. Pandya, JPR Hospitality Inc. / PRIVATE/CONFIDENTIAL**
1214 Corporate Drive
Holland, OH 43258
Email: drjanantik@gmail.com

JPR Hospitality Inc.
Attn: **Janantik N. Pandya**
1000 John R. Road, Suite 214
Troy, MI 48083
Email: drjanantik@gmail.com

<u>**NOTICE OF DEFAULT AND TERMINATION**</u>

*Re:*  *Red Roof Inn Franchise Agreement dated October 23, 2018, as amended ("Franchise Agreement") between JPR Hospitality Inc. ("Franchisee" or "you") and Red Roof Franchising, LLC ("we" or "us") for a franchised Red Roof Inn (the "Inn") located at 1214 Corporate Drive, Holland, OH 43528 (the "Approved Location")*

Dear Mr. Pandya:

Pursuant to the Franchise Agreement, we granted you the right (and you undertook the obligation) to operate the Inn at the Approved Location. Among other things, you agreed in Section 5.2 of the Franchise Agreement to operate the Inn in accordance with Red Roof Inn's System Standards. As you know, we sent you the enclosed Property Improvements and Quality notice dated April 9, 2021 (the "Notice") informing you that the Inn was not in compliance with our System Standards based on property visits conducted by us and was being operated in a manner that was adversely affecting the franchised System. In order to rectify that situation, the Notice demanded that you to undertake Short-Term Renovations, as required under Section 5.1 of the Franchise Agreement, to cure those issues of non-compliance. The Notice attached a list of the

---

 

Red Roof Corporate Headquarters • 7815 Walton Parkway • New Albany, OH 43054 • phone: 614.744.2600
redroof.com • redrooffranchising.com

required Short-Term Renovations and obligated you to complete all of those Renovations by May 31, 2021. The Notice further advised that the failure to complete the Short-Term Renovations would constitute a default of the Franchise Agreement.

As of the date of this letter, which is past May 31, 2021 after the your receipt of the Notice, you have failed to complete the Short Term Renovations listed in the attachment to the Notice that were required to cure your noncompliance with our System Standards and the Franchise Agreement. As indicated in the Notice, your failure to complete the Short Term Renovations as required under Section 5.1 of the Franchise Agreement constitutes a default under Section 13.2.14 of the Franchise Agreement. Moreover, because you did complete those Renovations by May 31, 2021 as specified in the Notice to cure your noncompliance, we have the right under governing law to terminate the Franchise Agreement upon written notice to you. In addition, because the manner in which you are operating the Inn reflects materially and unfavorably upon the reputation of the Inn and the Red Roof System, we have the further right under the Franchise Agreement and governing law to terminate the Franchise Agreement upon written notice to you. **Therefore, in accordance with Section 13.3, the Franchise Agreement is terminated effective as of June 11, 2021 ("Termination Date.").**

Except as may be otherwise specified in the Franchise Agreement, termination of the Franchise Agreement does not relieve you of any liabilities or obligations under the Franchise Agreement, including obligations that come due after the Termination Date. As of the Termination Date, you will be obligated to comply with all of the provisions of the Franchise Agreement that take effect upon termination (and those provisions that apply after termination), including but not limited to Section 14 ("Obligations Upon Termination"). Your obligations under that Section include, but are not limited to:

- Ceasing to represent to the public or to hold yourself out as a present or former Red Roof Inn franchisee.

- Immediately and permanently ceasing to use, by advertising or in any other manner whatsoever, the name "Red Roof Inn," any other Proprietary Marks or identifying characteristics of the System, and any and all Confidential Information.

- Immediately making such modifications or alterations as may be necessary to distinguish the Inn so clearly from its former appearance and from other Red Roof Inns as to prevent any possibility of confusion by the public.

- Taking such action as may be necessary to cancel any trade, fictitious or assumed name or equivalent registration which contains the mark "Red Roof Inn" or any other Proprietary Marks.

- Refraining from using any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, in connection with the operation of any other business.

- Timely paying all sums owed to us, our affiliates and our approved or designated suppliers. Our records reflect that you currently owe us $8,085.68, which must be paid within ten (10) days of the Termination Date.



- Paying us all damages, costs and expenses, including reasonable attorneys' fees, incurred by us in connection with your default and/or the early termination or expiration of this Franchise Agreement including, without limitation, those incurred to enforce and/or obtain injunctive or other relief.

- Immediately returning to us all Manuals and other Confidential Information, and all other records, files, instructions, correspondence and other materials provided by us related to the operation of the Inn, and all copies thereof.

In addition, because the termination of the Franchise Agreement is the result of your default under that Agreement, under Section 13.1 of the Franchise Agreement, you are obligated to pay us liquidated damages totaling $184,588.36. We demand that payment be made within ten (10) days of the Termination Date.

Further, as a result of the termination of the Franchise Agreement, the RediStay® Property Management Software Sublicense Agreement dated October 23, 2018 ("RediStay Agreement") is also terminated as of the Termination Date. As of the Termination Date, you will be obligated to comply with all of the provisions of the RediStay Agreement that take effect upon termination (and those provisions that apply after termination), including but not limited to Section 4.2 (Obligations Upon Termination or Expiration; Remedies Upon Breach).

If you fail to provide evidence of your compliance with your post-termination obligations under the Franchise Agreement and RediStay Agreement and pay the amounts owed to us (including liquidated damages) within ten (10) days of the Termination Date, we will take such actions as we deem appropriate to protect our rights, including pursuing a collection action or seeking injunctive relief to compel compliance. If we are forced to take such action, we will also seek to recover from you all costs and expenses (including attorneys' fees) we incur as a result of such action, as permitted under the Franchise Agreement and RediStay Agreement.

Finally, because Janantik N. Pandya and Ritesh M. Vaidya personally guaranteed your obligations under the Franchise Agreement, they are personally, and jointly and severally, liable for all obligations owed to us under the Franchise Agreement.

This letter does not waive any rights or remedies that we may have under the Franchise Agreement or applicable law.

Sincerely,

Michelle Stickel

Michelle Stickel
Director, Legal & Compliance



Enclosure

cc:  Matthew Hostetler, Chief Development Officer
     Fouad Malouf, Senior Vice President Franchise Operations
     Jane Palumbo, Vice President Franchise Operations
     Neil Scott, Franchise Operations Director





**Account Status Report**

Customer Account 94015

| Customer | Location (Inn Number) | Invoice Number | Transaction Type | Invoice Date | Invoice Amount | Balance Remaining |
|---|---|---|---|---|---|---|
| JPR HOSPITALITY INC. | HOLLAND, OH (20058) | 30504357 | FEE REDICARD CR | 05/31/2021 | (557.46) | (557.46) |
| | | **May-21 Total** | | | (557.46) | (557.46) |
| | | 30509146 | FEE REDICARD CR | 06/30/2021 | (355.84) | (355.84) |
| | | 30509147 | COM AFFILIATE SITE | 06/30/2021 | 61.17 | 61.17 |
| | | 30509148 | COM EXPEDIA | 06/30/2021 | 124.60 | 124.60 |
| | | 30509149 | COM TRAVEL AGENT | 06/30/2021 | 2.79 | 2.79 |
| | | 30509150 | COM GDS BOOKINGS | 06/30/2021 | 612.03 | 612.03 |
| | | 30509151 | FEE IT SERVICE | 06/30/2021 | 465.00 | 465.00 |
| | | 30509152 | FEE REDICARD | 06/30/2021 | 1,298.11 | 1,298.11 |
| | | 30509153 | FEE ROYALTIES | 06/30/2021 | 5,919.61 | 5,919.61 |
| | | 30509154 | FEE GUEST RELATIONS | 06/30/2021 | 515.67 | 515.67 |
| | | **Jun-21 Total** | | | 8,643.14 | 8,643.14 |
| **JPR HOSPITALITY INC. Total** | | | | | 8,085.68 | 8,085.68 |

# EXHIBIT G

July 29, 2021

**SENT VIA OVERNIGHT DELIVERY AND EMAIL**

JPR Hospitality Inc.
Attn: Janantik N. Pandya
1000 John R Road, Suite 214
Troy, MI 48083

## DEMAND TO CEASE AND DESIST

RE:     Former Franchised Red Roof Inn (the "Property") located at 1214 Corporate Drive,
        Holland, OH 43528 (Inn #058) (the "Location")

Dear Mr. Pandya:

In a Notice of Default and Termination dated June 10, 2021 (the "Termination Agreement"), Red Roof Franchising, LLC ("RRF", "we" or "our") terminated the Red Roof Inn Franchise Agreement for the Property (the "Franchise Agreement"), effective June 11, 2021 (the "Termination Date").  Under the terms of the Default and Termination, Franchisee shall comply with all of the termination obligations set forth in Section 14.1 of the Franchise Agreement. Those obligations include, among other things, immediately and permanently de-identifying the Property as a "Red Roof Inn," refraining from using, by advertising or in any other manner whatsoever, the name "Red Roof Inn," or any other name, trademarks, or service marks associated with RRF or the Red Roof Inn System ("the Proprietary Marks") or identifying characteristics of the System, and returning all proprietary materials to RRF.

It has recently come to our attention that Franchisee has failed to completely de-identify the Property in accordance with Section 3 of the Termination Agreement and Section 14.1 of the Franchise Agreement. Specifically, Franchisee has failed to remove the following Proprietary Marks and other proprietary items from the Property:

- Red Roof high rise sign

- Entrance sign

- Red Roof building sign

Your unauthorized use of the Proprietary Marks has the effect of representing to consumers that you and the Property are an authorized "Red Roof Inn" business.  As you know, that

---

THE     COLLECTION™          HOMETOWNE
                             STUDIOS®

representation is false and misleading, and is likely confuse consumers about the source and sponsorship of the Property. Because such false representations are likely cause confusion and mistakes among the consuming public, your continued use of the Proprietary Marks will dilute the value of the "Red Roof Inn" name. These actions constitute trademark, service mark, and trade dress infringement, false advertising, unfair competition, trademark counterfeiting, and misappropriation of trade secrets that could subject you to substantial liability to RRF. Indeed, RRF is entitled to recover its damages, your profits from the Property, and potential statutory damages. Moreover, because you are on notice that you are no longer authorized to use the Proprietary Marks, your continued use of those Marks constitutes willful infringement and could subject you to liability for treble damages, as well as any costs and attorneys' fees we incur in legal action to prevent such activity.

RRF therefore demands that you de-identify the Property and the Location **within ten (10) days**, that you immediately and permanently cease and desist from all further use of the Proprietary Marks, and that you provide us with evidence that you have removed the Proprietary Marks and other proprietary items listed above from the Location. If you fail to provide evidence of your compliance with these requirements and the other termination obligations specified in the Termination Agreement and the Franchise Agreement within ten (10) days, RRF will take such actions as we deem appropriate to protect our rights, including seeking injunctive relief to compel compliance. If RRF is forced to take such action, we will also seek to recover from you all costs and expenses (including attorneys' fees) we incur as a result of such action, as permitted under the Franchise Agreement.

Finally, because Janantik N. Pandya and Ritesh M. Vaidya are also parties to the Default and Termination and all personally guaranteed Franchisee's obligations under the Franchise Agreement, they are each personally, and jointly and severally, liable for all obligations owed to RRF under the Termination Agreement and the Franchise Agreement, including the termination obligations described above.

This letter does not waive any rights or remedies that we may have under the Termination Agreement, the Franchise Agreement, or applicable law. Please give immediate attention to this serious matter.

Sincerely,

*Michelle Stickel / JW*

Michelle Stickel
Director, Legal & Compliance

cc:     Fouad Malouf, Senior Vice President Franchise Operations
        Jane Palumbo, Vice President Franchise Operations
        Neil Scott, Franchise Operations Director